COMMONWEALTH *vs.* BARRY LEVIN
(and seven companion cases[1]).

Norfolk.   April 19, 1979. — May 4, 1979.

Present: ARMSTRONG, GREANEY, & PERRETTA, JJ.

*Practice, Criminal,* Execution of sentence, Appeal.

Under G. L. c. 279, § 4, the standard to be applied by a judge in determining whether to grant a stay of execution of sentence pending appeal is whether the defendant has a "reasonable likelihood of success on appeal," which is not substantial certainty of success but rather is equivalent to the civil concept of "meritorious appeal"; that is, an appeal which presents an issue which is worthy of presentation to an appellate court, one which offers some reasonable possibility of a successful decision in the appeal. [502-505]

When a denial of a stay of execution pending appeal is predicated, in whole or in part, on reasons of security, the denial should not be disturbed on appeal unless the defendant can demonstrate abuse of discretion; but where such a denial is predicated upon a conclusion that there is no meritorious issue to be presented on appeal, an appellate court may reverse the denial if, upon its evaluation of the legal contentions as presented to the judge denying the stay, it is left with a firm conviction that the appeal presents a meritorious issue. [506]

Whether at the trial of indictments for uttering a forged life insurance policy, larceny of the policy by false pretenses, and attempted larceny of the proceeds of the policy the judge erred in permitting the Commonwealth to introduce evidence that the insured had been killed by gunshot wounds was a sufficiently meritorious question to entitle the defendants to stays of execution pending appeal. [506-511]

INDICTMENTS found and returned in the Superior Court on July 6, 1978.

---

[1] Four of the companion cases are against the defendant Levin. Three of the companion cases are against the defendant Earle Groper.

Following trial and conviction of the defendants, a motion for stay of execution filed in the Appeals Court was heard by *Keville, J.*

*Gerald Alch* for Barry Levin.

*James D. St. Clair (Robert D. Keefe* with him) for Earle Groper.

*John P. Kivlan*, Assistant District Attorney (*William D. Delahunt*, District Attorney, with him) for the Commonwealth.

ARMSTRONG, J. Following a six-week trial in the Superior Court, the defendants were convicted of uttering a forged life insurance policy, larceny of the policy by false pretenses, and attempted larceny of the proceeds of the policy.[2] They were sentenced to terms of six to eight years at M.C.I. Walpole on the uttering convictions; other, shorter sentences concurrent with the six to eight year terms were imposed for various other convictions. Both defendants appealed. The trial judge denied stays of execution pending appeal (other than short ones for purposes of presenting motions for such stays in this court), as did a single justice of this court. See G. L. c. 279, § 4, as amended through St. 1972, c. 740, § 17. The cases are before us on appeals from the denials by the latter. See Appeals Court Rule 2:01, as amended, 3 Mass. App. Ct. 805 (1975); *Commonwealth* v. *Roberts*, 5 Mass. App. Ct. 881 (1977).

We begin by examining the scope of appellate review, which has been a subject of some disagreement among the parties. The Commonwealth contends that a stay of execution pending appeal lies within the discretion of the single justice and that the determination by the single justice will not be reversed in the absence of an abuse of discretion. That contention finds support in many cases,

---

[2] The defendant Levin was also convicted of two other offenses involved in the same series of events, namely, forgery and obtaining the signatures of the president and secretary of Charter National Life Insurance Co. by false pretenses with intent to defraud.

including *Commonwealth* v. *Drohan*, 210 Mass. 445, 448 (1912); *Lebowitch, petitioner*, 235 Mass. 357, 363 (1920); *Fine* v. *Commonwealth*, 312 Mass. 252, 261 (1942); *DiPietro* v. *Commonwealth*, 369 Mass. 964 (1976); *Commonwealth* v. *Roberts, supra*. Most recent cases have tended to lay special emphasis on whether the defendant has made a showing that he has a reasonable likelihood of success on appeal. See *Stranad* v. *Commonwealth*, 366 Mass. 847 (1974); *DiPietro* v. *Commonwealth, supra; Commonwealth* v. *Roberts, supra; Commonwealth* v. *Allen, post* 856 (1979).

In the case last cited, *Commonwealth* v. *Allen*, the defendant argued that the Legislature, by St. 1966, c. 678, had manifested an intention that stays should be granted regardless of whether the defendant has shown a reasonable likelihood of success. That statute amended G. L. c. 279, § 4, which had theretofore required the trial judge or a single justice, as a precondition of granting a stay of execution in a noncapital case, to file "a certificate that in his opinion there is reasonable doubt whether the judgment should stand." It was argued that, under G. L. c. 279, § 4, as amended, the standard to be applied by the single justice should be whether the appeal is "frivolous,"[3] a standard which was characterized as "less stringent" than the "reasonable likelihood of success" standard. By contrast, the Commonwealth argues in the present cases that the latter standard is not met unless the defendant is able to demonstrate a high probability of reversal on appeal. We reject both contentions.

It has been customary, on the criminal side of the court, to employ the words "reasonable likelihood of success," but on the civil side of the court to employ the words

[3] A single justice of the Supreme Judicial Court appears to have accepted that contention in ordering a stay of execution in *Commonwealth* v. *Allen* after a contrary determination by a single justice of this court had been affirmed by a panel of this court. See Memorandum of Decision in Commonwealth *vs.* Max J. Allen & others, S.J.C. No. 79-100 Civ.

"meritorious issue" or "meritorious claim" in analogous situations. A "meritorious claim," or "meritorious appeal," has been held to mean "one which is worthy of judicial inquiry because raising a question of law deserving some investigation and discussion," *Lovell* v. *Lovell*, 276 Mass. 10, 11-12 (1931); *Russell* v. *Foley*, 278 Mass. 145, 148 (1932), "one that is worthy of presentation to a court, not one which is sure of success," *General Motors Corp., petitioner*, 344 Mass. 481, 482 (1962). Despite the difference in terminology, the concepts are, in our view, substantially identical. Although our cases have not discussed the relationship between the terms, we can assert, on the basis of some familiarity, that in the day-to-day business of hearing applications for stays of execution of sentence in our single justice sessions, the concept that our judges have in mind when they apply the standard of "reasonable likelihood of success on appeal" is not one of substantial certainty of success, but rather is one equivalent to the civil concept of "meritorious appeal"; that is, an appeal which presents an issue which is worthy of presentation to an appellate court, one which offers some reasonable possibility of a successful decision in the appeal. Both the civil and criminal terms import the contradictory of the word "frivolous"; for how can it be said that an appeal which has no reasonable likelihood of success, which presents no meritorious issue to be determined on appeal, is other than "frivolous"?

The statutory change in 1966 may have been intended to enable the trial judge and the single justice to grant a stay of execution of sentence without making a determination that the appeal would present a meritorious issue; the correctness of that view does not arise in these cases because both judges denied the stays sought by the defendants. In an appeal such as these, from a denial of a stay of execution, we need not determine what circumstances might have warranted the granting of a stay, but only whether the judge erred in denying it. And the case law since the 1966 amendment has held unequivocally

that, "[w]here the [defendant] has not established a reasonable likelihood of success on appeal, there can be no abuse of discretion in denying a stay of execution of a sentence pending that appeal." *DiPietro* v. *Commonwealth*, 369 Mass. at 964. See also *Commonwealth* v. *Roberts, supra; Commonwealth* v. *Allen, supra.*

Two distinct categories of considerations should govern the exercise of discretion by the trial judge or the single justice in acting on a motion for a stay of execution of sentence pending appeal. There are those relating to security, such as the possibility of flight to avoid punishment and of further acts of criminality during the pendency of the appeal, as to which such factors as familial status, roots in the community, employment, prior criminal record, and general attitude and demeanor, are customarily taken into consideration. These considerations involve determinations of fact and the exercise of sound, practical judgment and common sense; and as to such considerations it is frequently said that the exercise of discretion by the judge will be upheld unless his action is one "that no conscientious judge, acting intelligently, could honestly have taken." *Commonwealth* v. *Roberts, supra,* quoting *Davis* v. *Boston Elev. Ry.,* 235 Mass. 482, 502 (1920). The other category of considerations (this category being first in terms of logical priority) is that relating to the likelihood of success on the merits of the appeal. These considerations present pure questions of law, or legal judgment, as to which an appellate tribunal is as competent to make an assessment as the trial judge or the single justice. In reviewing the judge's assessment of the questions of law presented by the appeal, the scope of review should be correspondingly broader; and if an appellate court has a clear conviction that an appeal does present a genuine and meritorious question of law for decision, there is no reason in logic why it should defer to the contrary judgment of the trial judge or the single justice.

We conclude, therefore, that when a denial by a single justice of a stay of execution pending appeal is predicated, in whole or in part, on reasons of security, the denial should not be disturbed on appeal unless the defendant can demonstrate abuse of discretion in the traditional sense mentioned above; but where such a denial is predicated upon a conclusion that there is no meritorious issue to be presented on appeal, an appellate court may reverse the denial if, upon its evaluation of the legal contentions as presented to the single justice, it is left with a firm conviction that the appeal does present a meritorious issue for decision on appeal, and thus that the defendant has a reasonable likelihood of success on appeal.

In the present cases the Commonwealth has not argued, either before the single justice or before us, that reasons of security are a factor to be considered in denying the stays of execution sought by the defendants. Both defendants are men with substantial roots in the community, who are active in professional or business affairs. They have not, so far as appears, had any prior criminal involvement; the crimes of which they stand convicted are not crimes of violence; and they have maintained at all times that they are innocent of those crimes. When the single justice denied the stays "in [his] discretion," he obviously did not have such factors in mind, and the Commonwealth does not contend that the denials could be sustained on that basis.

Rather, the case was put to the single justice, both by the defendants and by the Commonwealth, as one involving the sole issue whether the defendants had a reasonable likelihood of success on appeal; and when the single justice denied the motions for stay in his "discretion," we take this to mean that it was his opinion or judgment that the legal issues sought to be presented in the appeals lacked merit. Such an opinion or judgment is one of discretion in the broad sense that lawyers may differ in their assessment of the likelihood of success; but it is essentially an exercise of legal judgment, as to which the scope of

review is, as explained above, broader than that connoted by the "abuse of discretion" standard. We therefore turn to the legal contentions which the defendants indicated to the single justice that they would present in their appeals, to ascertain whether, in our view, those contentions are frivolous or are, on the contrary, meritorious contentions which give the defendants a reasonable likelihood of success in their appeals.

The trial judge was faced, from the outset, with a legal problem of obvious difficulty and one for which, so far as we can find, there was and is no particularly helpful precedent. The charges against the defendants, who were four in number (a doctor [Jacobson], a lawyer [Levin], an insurance agent [Effenson], and a businessman [Groper]), all concerned the procurement of an $800,000 insurance policy on the life of one George Hamilton and an effort to obtain the proceeds of the policy after Hamilton's well-publicized murder by gunshot wounds on April 25, 1976.

Hamilton was the president of a furniture store in Braintree, in which Groper had originally invested $195,-000 and Levin $83,000 in the form of direct loans, for which they received notes of the company, and had indirectly invested other substantial sums by way of loan guarantees. The company began to lose money from the time it opened in October, 1974, and Groper, Levin and others were called upon to invest more until, by August, 1975, when the company had lost more than a million dollars, Groper had invested around $600,000 and Levin $140,000. The notes given for these sums specified that the company was to take out life insurance on Hamilton's life and that the proceeds, in the event of Hamilton's death, were to be used to pay off the noteholders. The notes totaled approximately $1.3 million; by August, 1975, the directors of the company, who included Groper and Levin, had succeeded in obtaining only $1 million insurance coverage and had had other applications for insurance denied. By August, according to the Commonwealth's evidence, Groper and Levin had decided that the

financial woes of the company were largely due to Hamilton's managerial incompetence, and, unbeknownst to Hamilton, Groper had initiated a search for a successor and had offered the presidency to others, who declined. By March, 1976, the company was virtually insolvent, and Groper succeeded in working out an agreement with another furniture store to purchase the company. Part of the agreement, signed March 18, 1976, was that Hamilton would cease to be associated with the company. On March 23, 1976, the board voted to approve the sale, and the new owners indicated that they wanted Hamilton out immediately. He left that day.

In late February, after receiving a final rejection on additional insurance on Hamilton's life, Groper and Levin asked Effenson, a friend of Groper who was an insurance agent, to initiate an application with a "substandard" insurer. There was evidence that Effenson, without Hamilton's knowledge, filled out an application for an $800,000 policy, forged Hamilton's name to it and submitted the application; that Levin, who was treasurer of the company, caused a $500 invoice for the policy to be processed immediately, on March 5, at a time when most invoices were being held for 60 days or more; and that Jacobson, without having examined Hamilton, completed and signed a medical examination form to accompany the insurance application. On March 24, the day after Hamilton had ceased working, Levin and Effenson caused an agent for the insurance company to contact it to ascertain the status of the application. The insurance company, in ignorance of the fact that Hamilton was no longer a "key man" with the furniture store, authorized issuance of the policy. Groper and Levin then attempted to have the furniture store pay the balance for the first year of the policy—approximately $2,500. The new president objected to maintaining insurance on Hamilton's life, and ordered him removed from the payroll on April 3. The $500 partial payment was known to Levin and Effenson to be sufficient to keep the policy in force until

May 3, 1976. An April 23 meeting of the board of direc-
tors, which was scheduled to cancel the policy if it had not
been done already, was cancelled by Levin.

It was with matters in this posture that Hamilton, on
April 25, 1976, at 3:30 A.M., was shot to death by an
unknown assailant at his home in Canton. In the ensuing
investigations, Groper and Levin concealed the existence
of the new $800,000 policy from the police. Both men
discussed the claim for the policy proceeds with counsel
and, when a question came up concerning possible ques-
tions which might arise from the fact that Hamilton was
not an employee at the time of his death, Levin instructed
the payroll clerk to amend the payroll records and for-
ward to Mrs. Hamilton checks for the period from Hamil-
ton's removal from the payroll to his death. Upon a refus-
al by the clerk, Levin himself amended the records.[4]

Before the jury were empanelled or the trial com-
menced, the four defendants (including Jacobson and Ef-
fenson) filed motions that the Commonwealth be ordered
not to submit evidence concerning the murder of Hamil-
ton. They offered to stipulate to the bare fact of death, a
fact which could hardly be excluded as it constituted the
basis for the charges of uttering the forged policy and
attempted larceny of the proceeds. But the defendants
took the position that the fact that the death was a homi-
cide was overwhelmingly prejudicial and, in the absence
of evidence connecting them with the homicide, not rele-
vant to the charges which were to be the subject of the
trial. The Commonwealth took the position that the
homicide was relevant both as a background fact and as
bearing properly on the issue of motive, and apparently
indicated that it was prepared to introduce evidence "con-
necting" the defendants with the homicide. After some

---

[4] We emphasize that the foregoing outline of the evidence may con-
tain inaccuracies, because it is necessarily based in large part on the
recollections of counsel rather than on the transcript, which is not yet
available.

research the judge ruled that the Commonwealth would be permitted to put in evidence the bare fact that Hamilton was killed on April 25, 1976, by gunshot wounds but would not be permitted to introduce any other evidence concerning the circumstances of his death or any evidence connecting the defendants to his death. The judge indicated that he reserved judgment concerning whether the defendants could introduce evidence of the circumstances of Hamilton's death in an attempt to disprove any connection. (The defendants did not attempt to do so.) He denied the defendants' oral motions for a voir dire to determine if the Commonwealth had any evidence connecting the defendants to the homicide and for examination of the minutes of the grand jury which had investigated the homicide.

It seems obvious that any evidence connecting the defendants with Hamilton's death would have been, as the Commonwealth contended, relevant on the issue of motive. But the judge was obviously determined to prevent the trial on the insurance fraud indictments from degenerating into a trial for a murder which had not been charged. If that was error, it might be thought more prejudicial to the Commonwealth than the defendants; but it is difficult, if not impossible, to assess the impact on the jury of the bare fact of homicide, which, left unexplored and unexplained, may have led them to draw inferences that the defendants were responsible for Hamilton's death;[5] and though they may have been charged (in an ambivalent instruction to which the defendants took exception) that they should not draw inferences adverse to the defendants from the fact of Hamilton's murder,[6] it

---

[5] It might conceivably be argued that the defendants' complicity in Hamilton's murder could properly be inferred by the jury from the evidence it was permitted to hear. Compare *Commonwealth* v. *Bader*, 285 Mass. 574, 577 (1934).

[6] That instruction was immediately followed by one which stated: "However, you have a right to consider the death of George Hamilton and the date of his death to the extent that that is material and

is arguable that adherence to such an instruction in the unusual circumstances of this case strains credulity and that the sounder course, had the judge chosen (as he did) to exclude evidence bearing on any connection between the defendants and the murder, would have been to admit the fact of death but exclude the fact of murder.[7] Moreover, the judge indicated at several other times that the evidence of homicide was admissible on the question of motive. Our conclusion, based on this issue alone, an issue which obviously affects the convictions on all the indictments, would be that the appeals are not frivolous but rather are worthy of consideration by an appellate court. We reach this conclusion without suggesting that the judge's ruling was reversible error and indeed without having reached any conclusion that some alternate disposition of the defendants' motions would have been more defensible than the one the judge adopted. The problem which confronted the judge was of such inherent complexity that any resolution would have raised the possibility of legal error.[8] The issue cannot and should not be decided on the basis of the truncated record available to us at this time. The only issue presently before us, and the only issue we decide, is whether the defendants' appeals have a reasonable likelihood of success, in the sense described above. They clearly do.

There are other issues which the defendants intend to raise on appeal, which also seem to us to be meritorious

---

relevant to any of the indictments that are before you. So I am sure that you understand that."

[7] It should be pointed out that such a ruling would have necessitated sanitizing certain evidence which the Commonwealth could hardly have been precluded from putting in evidence, such as the insurance claim form, which was signed by both Groper and Levin, and which recited that the cause of death was "[g]unshot wound."

[8] The judge could, of course, have avoided the possibility of an appealable issue (as opposed to the possibility of error) by excluding any reference to the homicide; but, as has often been observed, the public is badly served by judges who make rulings with a view not to the legal merits but to avoiding reversal on appeal.

(although by no means sure of success), such as whether, after the insurance company had disclaimed liability under the policy and returned the premium, the submission of the claim form necessary to assert a claim for the proceeds of the disputed policy could properly be characterized as an attempted larceny; also, whether there was an inconsistency between the charges of forgery of the policy and larceny of the policy. We shall not further discuss these and other issues which the defendants will raise; it is sufficient for present purposes to ascertain that the defendants have a reasonable likelihood of success on one legal contention which affects all the convictions.

A further factor which we have taken into consideration is that the defendants Jacobsen and Effenson, whose applications for stays of execution pending appeal were heard by another single justice, were granted such stays. This would not be a decisive factor if the defendants Groper and Levin had not shown a reasonable likelihood of success in their appeals; but where they have, or even if the showing were marginal, equality in treatment of defendants similarly situated is desirable. Compare *Commonwealth* v. *Nelson*, 3 Mass. App. Ct. 90, 101 (1975), *S.C.* 370 Mass. 192, 195, 203 (1976); *Commonwealth* v. *Hogan, ante* 236, 242 (1979).

We single out a further point for brief mention. The Commonwealth, in its argument on appeal, urged that the defendants should not be accorded favorable treatment because of the fact that they are men of prominence in the community and of substance in material terms. One can hardly quarrel with that point, taken at face value. But the customary and long-standing practice, as the Commonwealth knows, is to grant stays of execution of prison sentences where a defendant demonstrates that he has a reasonable likelihood of success on appeal, unless the granting of such a stay poses risks which cannot be adequately dealt with through the mechanism of bail. The practice is grounded in rudimentary notions of justice, for the right of appeal, which our law accords all

persons convicted of crime, would otherwise be made nugatory in the case of a short sentence, and would be impaired in the case of a larger sentence: The conviction may be reversible, but the time spent in prison is not. We resist any suggestion that men of wealth or prominence should be denied rights which are routinely accorded others in our courts, that they should be subjected to special obloquy and disgrace. It hardly needs repetition, that the principle by which our courts must be guided is steadfast adherence to the concept of equal justice under the law for rich and poor alike.

The cases are remanded to the Superior Court, where the trial judge should enter stays of execution of the prison sentences in accordance with the principles expressed above. The stays may be made subject to such conditions as the judge may in his discretion impose, including time limitations calculated to ensure prompt hearing of the appeals on the merits. See *Stranad* v. *Commonwealth*, 366 Mass. at 848.

*So ordered.*