CARLO TORRE vs. HARRIS-SEYBOLD CO.

Hampden.   March 10, 1980. — May 6, 1980.

Present: BROWN, GREANEY, & KASS, JJ.

*Practice, Civil*, New trial. *Negligence*, Manufacturer, Cutting machine.
  *Evidence*, Safety standards, Safety improvements.

After a jury verdict for the defendant in a products liability action
  brought by a plaintiff who was injured while working on a precision
  paper cutting machine manufactured by the defendant, the judge did
  not abuse his discretion in granting the plaintiff's motion for a new
  trial on the ground that the defense counsel's final argument improper-
  ly and prejudicially interjected the issue of workmen's compensation
  into the trial; the plaintiff's failure to object to the argument did not
  preclude the judge from ordering relief by way of a new trial.
  [662-666]
At the trial of a products liability case, the judge did not abuse her discre-
  tion in refusing to admit in evidence under G. L. c. 233, § 79B, a
  resolution of approval concerning the type of machine in question by
  the Board of Standards and Appeals of the State of New York and a
  pamphlet from the board of standards where it was not established
  that the publications were commonly used and relied upon by the in-
  dustry, that the "approvals" constituted statements of simple objective
  facts rather than conclusions or opinions, and that the machine in
  question was substantially similar in design to the earlier model which
  had been approved.  [668-674]
At the trial of a products liability action brought by a plaintiff who was
  injured in 1970 while working on a precision paper cutting machine
  manufactured by the defendant in 1961, the judge did not err in allow-
  ing the jury to consider evidence pertaining to a similar machine, pur-
  chased by the plaintiff's employer in 1976, on the issue of the feasibility
  of better safety devices in 1961 or 1970 for the defendant's product
  where there was independent evidence presented by the plaintiff's ex-
  pert of such feasibility.  [674-677]
At the trial of a products liability case, the judge's charge to the jury ade-
  quately explained the law applicable to the issue of design negligence
  in accordance with the principles set forth in the decision of *Uloth* v.
  *City Tank Corp.*, 376 Mass. 874 (1978).  [677-679]

TORT. Writ in the Superior Court dated March 23, 1972.

After trial of the case before *Donohue*, J., a District Court judge sitting under statutory authority, a motion for a new trial was allowed by him.

The case was retried before *Griffin*, J.

*Thomas J. Donoghue* for the defendant.

*John H. Madden, Jr.*, for the plaintiff.

GREANEY, J. This is a products liability case, predicated on the negligent design of a precision paper cutting machine manufactured by the defendant and known as the "Seybold Saber II Cutter." The plaintiff was injured on April 27, 1970, while working on the machine as an employee of the Milton Bradley Company in East Longmeadow, when a hydraulically operated clamp designed to hold in place the materials being sheared during the machine's cutting cycle came down and crushed a portion of his left hand. The action has been tried four times: once before a master, facts not final, and three times to juries in the Superior Court. The master issued a report dated September 4, 1975, which found that the machine was defectively designed in certain aspects and that the defects were the proximate cause of the plaintiff's injuries. He assessed damages in the amount of $30,000. The case was then tried to a jury in May, 1976, which was unable to agree on a verdict, and a mistrial was declared. The case was again tried in March, 1977, to a jury which found for the defendant. After this jury verdict, the trial judge granted the plaintiff's motion for a new trial (Mass.R.Civ.P. 59[a], 365 Mass. 827 [1974]), on the ground that the defense counsel's final argument improperly and prejudicially interjected the issue of workmen's compensation into the trial. The case was subsequently tried in March, 1979, to a jury (third jury trial) which found for the plaintiff and assessed damages in the amount of $40,000. The defendant argues that the judge erred in granting the plaintiff's motion for a new trial after the second jury trial. We have concluded that the judge did not abuse his discretion in allowing the motion and consequently affirm that order. The defendant also contends that the judge at the third jury trial erred in two evidentiary rulings and in

declining to give a certain jury instruction requested by the defendant on the issue of its liability. We have concluded that the judgment entered on the jury verdict after the third jury trial is to be affirmed.

## I.   MOTION FOR NEW TRIAL.

At the close of his summation to the jury in the second jury trial, counsel for the defendant argued as follows:

> "Well there may be other suggestions made to you about industry treating its employees as economic servants and throwing them on the junkpile when they're injured, and that kind of argument. And I say to you that's a completely unfair argument, because as working people, you know that industry today doesn't throw people on the junkpile. We have laws to compensate people when they are injured, and it isn't fair argument to address to you that kind of a suggestion, that this person was thrown on any economic junkpile because he injure[d] his hand.

> "We know he got an injury. We're sympathetic about it. But unfortunately our society has not yet reached the point where we compensate people under all circumstances for wherever and however their injury occurred. If there's fault involved and they contributed to the happening of the accident, we don't reward them under present circumstances. If there's no fault involved, there is a compensation system for motor vehicles. But that's a limited part of our society now. We . . . could change all that, we could have a national health system so whether you're injured at home or at work in your automobile you get compensated for your medical bills and all. But we don't have that. We're under a fault system in this. And if you've caused your own injury — well we have some protection for those people when they're at work and when they're injured at work. It isn't as if I slipped at my

own house, unless I got a health and accident policy I don't recover. But at work, we know there's compensation for injuries at work. So don't be misled by that type of suggestion made to you."

The plaintiff's counsel did not draw the judge's attention to this portion of the closing when the summation was completed or prior to the charge. The defendant does not attempt to justify the argument[1] but contends only that the lack of an objection by plaintiff's counsel barred the judge from ordering relief by way of a new trial.

"It is the general rule in trials of both criminal and civil causes that where an improper argument is addressed to a jury the attention of the judge should be called to it at once." *Commonwealth* v. *Richmond,* 207 Mass. 240, 250 (1911). *Commonwealth* v. *Johnson,* 374 Mass. 453, 458 (1978), and cases cited. If the judge had denied the motion for a new trial because of the failure of plaintiff's counsel to seek a remedy during the trial proper, nothing of merit would be brought here for review. *Commonwealth* v. *Johnson, supra* at 458. See also *Giffin* v. *Ensign,* 234 F.2d 307, 316 (3d Cir. 1956); *Hobart* v. *O'Brien,* 243 F.2d 735, 741-742 (1st Cir.), cert. denied, 355 U.S. 830 (1957). However, the defendant overlooks an important proposition central to our review of the judge's action, namely that by granting relief the judge exercised his discretion in favor of considering the question despite the lack of a request for relief at the trial (*Raunela* v. *Hertz Corp.,* 361 Mass. 341, 345 [1972]) and determined that an injustice had occurred which could best be remedied by a new trial. Thus, we are passing on a discretionary ruling of a trial judge in a context where an abuse

---

[1] In his brief for the defendant, defense counsel admits that the argument made "a veiled reference to workmen's compensation" but states that "the remarks made were based on some preparatory conferences which unfortunately were not recorded." In the absence of any indication in the record as to what may have spurred the remarks or any record of what transpired at the conferences, we cannot accept undocumented assertions as justification for the questioned references.

of discretion will be found only when the appellate court can say with substantial certainty that a reasonably conscientious judge faced with the same situation would not have concluded that the argument was prejudicial, that it might have affected the verdict, or that on a survey of the whole case a miscarriage of justice has resulted.[2] See *Nicholas* v. *Lewis Furniture Co.*, 292 Mass. 500, 507 (1935); *Spiller* v. *Metropolitan Transit Authy.*, 348 Mass. 576, 580 (1965); *Saba* v. *Khouri*, 357 Mass. 783 (1970). See also *Davis* v. *Boston Elev. Ry.*, 235 Mass. 482, 502 (1920); *Hartmann* v. *Boston Herald-Traveler Corp.*, 323 Mass. 56, 59-61 (1948); *Commonwealth* v. *Levin*, 7 Mass. App. Ct. 501, 505-506 (1979). Our deference to the trial judge's role on these motions recognizes the historical antecedents of the power, as well as the principle that its wise exercise is not in derogation of the right of a trial by jury but is one of the historical safeguards of the right. *Aetna Cas. & Sur. Co.* v. *Yeatts*, 122 F.2d 350, 353-354 (4th Cir. 1941), and cases cited. It also reflects the obvious fact that the trial judge, when faced with this type of misconduct, is generally in the best position to determine whatever harmful effects may have resulted from the jury's exposure to improper argument. *O'Neill* v. *Ross*, 250 Mass. 92, 96 (1924). *Shea* v. *D. & N. Motor Transp. Co.*, 316 Mass. 553, 555 (1944). Bowers, The Judicial Discretion of Trial Courts, § 18 (1931). "The test is not what we would have done if we were in the position of the motion judge . . . [r]ather it is whether . . . the record be-

---

[2] Although Mass.R.Civ.P. 59 expressly incorporates pre-rules Massachusetts case law on the granting of a new trial and, in this respect is not comparable to the counterpart Fed.R.Civ.P. 59 (see Smith & Zobel, Rules Practice § 59.2 [1977]), it is worth noting that the cases decided under the Federal rule share common ground with our cases on the points that motions for new trial are addressed to the sound discretion of the trial judge (see cases collected from all the circuits in 11 Wright & Miller, Federal Practice and Procedure § 2803, at 33 n.25 [1973]), and that the trial court's disposition of a motion for new trial is entitled to considerable deference on appeal and will be reversed by the appellate court only for an abuse of discretion (see cases collected in 11 Wright & Miller, *supra* § 2818, at 119 n.49).

fore us warrants the action of the motion judge in ordering a new trial. We believe that it does and in this situation we do not allow ourselves the idle luxury of speculating on whether we would have acted differently if we had presided over the hearing on the motion for a new trial." *Commonwealth* v. *Cook*, 380 Mass. 314, 325 (1980).

An abuse of the judge's discretion has not been demonstrated in this case. Although the argument appears at first glance plausibly to contend that the plaintiff must establish fault to prevail, the last two sentences weave together the whole and unmistakably convey the message that the plaintiff's rights have been protected by workmen's compensation insurance. This is virtually admitted by the defendant (note 1, *supra*). This insinuation of the existence of a possible collateral source of recovery lacked the approbation of the judge (a recommended procedure for forays into this area is discussed in *Goldstein* v. *Gontarz*, 364 Mass. 800, 814 [1974]), and is squarely condemned by our cases (*West* v. *Molders Foundry Co.*, 342 Mass. 8, 9 [1961]; *Benson* v. *Guyette*, 350 Mass. 759 [1965]; *Goldstein* v. *Gontarz, supra* at 808-812). "[T]he implication of the settled law here and elsewhere is that [reference to workmen's compensation] is prejudicial unless in some way palliated." *Id.* at 808. The merits of the case were close — it had already deadlocked one jury and essentially came down to a duel of experts as to whether parts of the machine were defectively designed and whether the plaintiff was contributorily negligent — so that the intrusion of the impermissible matter may have eased the jury towards a defendant's verdict by permitting speculation that the plaintiff's injuries had already been financially redressed and a verdict in his favor would lead to an unjust double recovery, or speculation that the real contest was between faceless insurance companies seeking to adjust the loss between themselves. See Schwartz, The Collateral-Source Rule, 41 B.U.L. Rev. 348 (1961). Additionally, the judge may have considered that the argument was the last substantive point made to the jury by defense

counsel, that plaintiff's counsel did not effectively respond to it,[3] and that his own brief instructions on the role of the closing arguments[4] did not amount to "rigorous and emphatic action" on his part "to make certain that the jury would disregard [the] appeal to them to violate their duty." *London* v. *Bay State St. Ry.*, 231 Mass. 480, 486 (1919). The judge's exercise of his discretion is thus supported by sufficient indicia in the record that the misconduct may have influenced the jury and tainted their verdict. Contrast *Commonwealth* v. *Smith*, 342 Mass. 180, 188 (1961). We distinguish this case from *Evans* v. *Multicon Constr. Corp.*, 6 Mass. App. Ct. 291 (1978), relied upon by the defendant. In that case the improper remarks were found not to have influenced the jury's consideration of the dominant issues, in view of the actions of counsel and the judge during the entire trial.

---

[3] Counsel for the plaintiff stated in his summation that the case "has been well and fairly tried." He also said: "What if a little paper did get wasted once in a while? Isn't it better to do that than to take a productive member of society like Carlo Torre, with his family, and in essence put him on the junkheap? That's my brother's phrase, not mine." The trial judge, by allowing the motion, apparently accepted the plaintiff's contention that the references to workmen's compensation put him on the horns of a "crippling dilemma" because an objection during his opponent's summation would have highlighted the issue of workmen's compensation even further and a cautionary instruction from the judge would have "crystalliz[ed]" in the jury's mind the fact that the plaintiff had received workmen's compensation." We hasten to point out again, however, that if the trial judge had rejected this contention, and on his survey of the whole case had denied the motion for a new trial, there would be little for us to review. It is still fundamental that trial counsel faced with improper argument must, to save his rights in the ordinary course, call the attention of the trial judge to the impropriety. It is usually sufficient if the judge's attention is directed to the offending material at the end of the attorney's argument. Failure to proceed in this manner in a civil case will usually deprive the aggrieved party of the right to seek appellate review of the claimed erorr. See *Commonwealth* v. *Johnson*, 374 Mass. 453, 458 (1978).

[4] "As far as the opinions of . . . counsel for the [p]laintiff and [d]efendant, they are of no consequence. The attorneys have a duty to make the openings and closing arguments. However, that is not evidence. That function is merely used to aid and assist you."

## II.   THE THIRD JURY TRIAL.

Before discussing the remaining issues, some background is necessary. The paper cutter in question was manufactured in 1961 by the defendant and installed at the Milton Bradley plant. It makes precise right angle cuts through large stacks of paper and other materials. It has both a clamping cycle designed to squeeze excess air out of the paper stacks and to hold them firmly in place for the blade, and a cutting cycle, during which a guillotine knife shears through the material at the desired point to create a uniform and precise edge. A recessed foot treadle activates the hydraulically operated clamping cycle. If the treadle is pushed all the way down, a metal bar approximately three quarters of an inch in width and sixty inches in length descends in one and one half seconds. A side control permits the operator of the machine to adjust the pressure on the clamp within a range of 600 pounds to three tons based on the quantity and nature of the materials to be cut. Once the materials are clamped, the cutting cycle is engaged by the operator's simultaneously activating two hand controls located underneath the machine's working surface. The plaintiff testified that he had worked on the machine on and off for a number of years. While cutting a pile of twenty booklets on April 27, 1970, with the clamping pressure set at approximately 2,500 pounds, he attempted to correct an error in the position of a booklet with his left hand when the clamp came down, crushing a portion of the hand. He was unable to remember clearly whether his foot on the treadle inadvertently activated the clamp or whether it came down by itself.

The plaintiff presented the testimony of two experts. The first, Igor Paul, a mechanical engineer with a specialty in machine design and control systems, testified that the control system for the cutting cycle provided effective safety by requiring both of the operator's hands to be under the machine when the controls activating the shearing knife were engaged but that the machine was defectively designed

as to the clamping sequence because it would not properly protect the operator's fingers at an essential point of operation. He testified that during normal and foreseeable operation, a momentary distraction or inadvertence on the part of the operator could engage the treadle, causing the clamp to catch a hand in less time than an average human being could react to the danger. In his opinion, it was possible, given the state of the art in 1961 and 1970, to design protection for the hands of the operator during the clamping cycle by two safety devices that will be discussed in more detail later in this opinion. The plaintiff's second expert, Stephen W. Meagher, a reconstructive hand surgeon and a functional anatomical analyst,[5] expressed the opinion that the foot pedal and the clamping bar were functionally misdesigned, that all nip, crush or shear points at the point of operation should have been guarded, and that the clamping area at the crush points should have been protected by certain enumerated safety devices.

The defendant's experts, Ralph L. Barnett, a civil engineer with an advanced degree in theoretical and applied mechanics, and Lawrence R. Stafford, a consulting engineer with experience in machine design, both testified that the machine at the critical times met all existing design and safety standards for machines of its character and that the safety measures recommended by the plaintiff's experts for the machine were not feasible or appropriate given the state of the art in 1961 or 1970 for a precision cutter of this size.

1. *"Standards."* The defendant cites as error the judge's refusal to admit in evidence a resolution of approval con-

---

[5] The witness described the field of functional anatomical analysis as using "the knowledge of functional anatomy to focus upon the interface between man and machine or man and product or man and his environment . . . . [There are] safety needs . . . imposed upon [man] by the limitations of [his] anatomy. These are the needs that must be fulfilled by designers and manufacturers in order to avoid presenting [a human] with an unnecessary risk of injury." He also testified that this type of expertise has been "used very widely in the aero space industry and the automobile industry and the primary thrust of my work . . . is to promote its use among designers, manufacturers and others."

cerning the type of machine in question by the Board of Standards and Appeals of the State of New York (board of standards). A copy of the original resolution of approval and a pamphlet from the board of standards were offered to the court solely under G. L. c. 233, § 79B, inserted by St. 1947, c. 385, § 1.[6]

The defendant first offered the exhibits in the course of cross-examining the plaintiff's expert Paul who, among his other credentials, held the position of machine design editor for a publication entitled "Product Safety News." This witness testified in substance that from 1961 to 1970 there were no governmental organizations setting standards for paper cutters but that a State organization (the bureau of standards) listed various brands of machinery as acceptable or not acceptable for purchase by New York State. He testified that the board of standards was not a "safety-standard-setting organization," and that the board, in his opinion, did not provide approvals for machine design although "the trade knew about" the board.

A voir dire followed this testimony. During the voir dire, defense counsel explained the rule making authority of the board of standards by a brief reference to certain New York labor statutes contained in a pamphlet.[7] It is not clear from the record if the judge's attention was called to the New York statutes (G. L. c. 233, § 70), or if she was shown the pamphlet. Defense counsel then read into the record a portion of the board's approval dated December 6, 1955.[8] The only evidence linking the machine at issue with the approval

---

[6] "Statements of facts of general interest to persons engaged in an occupation contained in a list, register, periodical, book or other compilation, issued to the public, shall, in the discretion of the court, if the court finds that the compilation is published for the use of persons engaged in that occupation and commonly is used and relied upon by them, be admissible in civil cases as evidence of the truth of any fact so stated."

[7] The board of standards was stated to have authority to make rules for "[t]he arrangement and guarding of machinery."

[8] The date of issuance of the pamphlet published by the board has not been made clear in the record.

was an interrogatory answer which listed as model letters for the machine one of the types of machines mentioned in the approval. Upon suggestion that defense counsel elicit more information from the witness, Paul was shown the pamphlet and testified that he had never seen it before. He also testified that he had learned of the board's existence only when it was mentioned in the testimony at a prior trial of this case and that the board had "no published safety standards." At this juncture, the judge excluded the exhibits on the basis that she was unable to make the findings required by § 79B, that they were compilations published for persons engaged in a specialized occupation and that they were commonly used and relied upon by them.

After the trial proper resumed, the other experts disagreed concerning the status of the approval. The plaintiff's expert Meagher testified that he was not aware of industry standards for paper cutters in 1961 and 1970, that he had learned of the board of standards for the first time in the courtroom that day, that he would question whether its work set "standards or not," and that, as of the date of the trial in 1979, he was aware only of "OSHA [as] a governmental organization [setting standards] and they don't have anything in their work on cutters." The defendant's first expert, Barnett, testified that he was familiar with the board of standards, that its function was "to review the safety of machines which are used in the State of New York," and that because "no other states [were] doing it," the board's approval was relied upon by the industry "like . . . an Underwriter's Laboratory approval" of a consumer product. The defendant's second expert, Stafford, testified that the board of standards promulgated safety standards to prevent industrial accidents arising from machine processes; that from 1969 to 1973, the New York industrial codes which established standards for paper cutters were under revision, with the result that the board had to review, for compliance with the intended revisions, several hundred approvals of machines, some of which dated back to 1920; and that approvals were made available to the manufacturer

and "people in the printing and publishing industry" but to the public only "upon written request." The judge rejected a renewed offer of the exhibits after Barnett's testimony, stating that the board did not "set any standards. It is just approval for that particular machine." Defense counsel declined the judge's offer to "go into it" further with the witness Barnett. He renewed his offer after the testimony of the witness Stafford.

Many jurisdictions, including Massachusetts, recognize that safety standards for industrial machines or consumer products enacted by governmental organizations pursuant to their rule-making power, or by trade associations, industry groups, and governmental and nongovernmental testing organizations are admissible in the sound discretion of the trial judge in product liability cases when offered either by the plaintiff (see *doCanto* v. *Ametek, Inc.*, 367 Mass. 776, 784 [1975]; *Fegan* v. *Lynn Ladder Co.*, 3 Mass. App. Ct. 60, 62 [1975]), or by the defendant (see *Back* v. *Wickes Corp.*, 375 Mass. 633, 636 [1978]; *Nordstrom* v. *White Metal Rolling & Stamping Corp.*, 75 Wash. 2d 629, 637 [1969]). Such standards may be useful to the judge or jury in a variety of ways: as evidence of a failure to exercise due care (see *Boston & Maine R.R.* v. *Talbert*, 360 F.2d 286, 290 [1st Cir. 1966]; see also *Boston Housing Authy.* v. *Hemingway*, 363 Mass. 184, 200 n.16 [majority opinion] and 209 n.2 [Quirico, J., concurring and dissenting] [1973]; *Schaeffer* v. *General Motors Corp.*, 372 Mass. 171, 175-176 [1977]); as proof that the defendant knew or should have known of the defect (see *doCanto* v. *Ametek, supra* at 783-784); as evidence of the availability or feasibility of a remedy to correct a defect (*ibid.*, see also *Boeing Airplane Co.* v. *Brown*, 291 F.2d 310, 316 [9th Cir. 1961]); as reflective of industry custom and practice (see *Back* v. *Wickes Corp., supra* at 641-643; *McComish* v. *DeSoi*, 42 N.J. 274, 282 [1964]); and as a basis for the examination or cross-examination of expert witnesses [see *Back* v. *Wickes Corp., supra* at 637-638; *Calley* v. *Boston & Maine R.R.*, 92 N.H. 455, 459 [1943]). If the evidence of standards is not of the

type admissible under G. L. c. 233, § 70 or § 75,[9] it may be amenable to offer under other exceptions to the hearsay rule,[10] or under G. L. c. 233, § 79B. If the evidence is offered under the last mentioned statute, preliminary findings are required that the intended exhibits are "compilations issued to the public and published for the use of persons engaged in the particular occupation and commonly used and relied on" (Mazzaro v. Paull, 372 Mass. 645, 650-651 [1977]; accord, Ricciutti v. Sylvania Elec. Prod., Inc., 343 Mass. 347, 351 [1961]), and that the compilations list "simple objective facts and not conclusions or opinions." Mazzaro v. Paull, supra at 652. As with other preliminary ques-

---

[9] Section 70 provides: "The courts shall take judicial notice of the law of the United States or of any state, territory or dependency thereof or of a foreign country whenever the same shall be material."

Section 75, as amended by St. 1943, c. 190, provides: "The printed copies of all statutes, acts and resolves of the commonwealth, public or private, which are published under its authority, and copies of the ordinances of a city, the by-laws of a town or of the rules and regulations of a board of alderman, if attested by the clerk of such city or town, shall be admitted as sufficient evidence thereof in all courts of law and on all occasions. Printed copies of rules and regulations purporting to be issued by authority of any department, commission, board or officer of the commonwealth or of any city or town having authority to adopt them, or printed copies of any city ordinances or town by-laws, shall be admitted without certification or attestation, but, if their genuineness is questioned, the court may require such certification or attestation thereof as it deems necessary."

[10] Problems attendant on the admission of this type of evidence are discussed in the law reviews as follows: Morris, The Role of Administrative Safety Measures in Negligence Actions, 28 Tex. L. Rev. 143 (1949); Philo, Use of Safety Standards, Codes and Practices in Tort Litigation, 41 Notre Dame Law. 1 (1965); Comment, Admissibility of Safety Codes, Rules and Standards in Negligence Cases, 37 Tenn. L. Rev. 581 (1970); and Miller, The Occupational Safety and Health Act of 1970 and the Law of Torts, 38 Law & Contemp. Prob. 612 (1974). See also Annot., Admissibility in Evidence, on Issue of Negligence, of Codes or Standards of Safety Issued or Sponsored by Governmental Body or by Voluntary Association, 75 A.L.R. 2d 778 (1961). Decisions that have treated the issue of admissibility of safety codes apart from a statute permitting their admission have held them admissible, in the trial judge's discretion, based on findings of trustworthiness, relevancy, materiality and necessity. See Nordstrom v. White Metal Rolling & Stamping Corp., supra at 641; Lemery v. O'Shea Dennis, Inc., 112 N.H. 199, 201 (1972).

tions of fact concerning the admissibility of evidence, the determination of the trial judge is conclusive if there is evidence to support it (*Coghlan* v. *White,* 236 Mass. 165, 169 [1920]; *Fauci* v. *Mulready,* 337 Mass. 532, 540 [1958]; *Ricciutti* v. *Sylvania Elec. Prod., Inc., supra* at 351), and both the express terms of the statute and case law in the area reserve a large measure of discretion to the trial judge in passing on admissibility. G. L. c. 233, § 79B. *Mazzaro* v. *Paull, supra* at 652. See *Lemery* v. *O'Shea Dennis, Inc.,* 112 N.H. 199, 201 (1972).

Our review of the judge's rulings is hampered by the fact that the proffered exhibits have not been included in the record. Based on what we do have, we find no abuse of discretion in the judge's actions. There was a considerable measure of conflict among the experts as to whether the industry relied upon the publications. The plaintiff's experts expressed the view that the publications were not well known and that they had learned of them only through the litigation. The defendant's experts considered them well known to persons in the field. With the evidence in this state, we are reluctant to second guess the trial judge's determination, as to foundation, that independent evidence was lacking to show that the publications were commonly used and relied upon by the industry. See *Reddington* v. *Clayman,* 334 Mass. 244, 248 (1956), and cases cited. Moreover, the judge could have concluded, based on this record, that the "approvals" constituted conclusions or opinions rather than statements of simple objective facts of the type contemplated by § 79B. See *Mazzaro* v. *Paull, supra* at 649-650. Finally, the judge could have found that there was no reliable evidence linking the paper cutter in question, which was manufactured in 1961, and which injured the plaintiff in 1970, to the plans and specifications for the defendant's earlier paper cutter which were the basis for the 1955 approval and which apparently were not part of defendant's offer of proof. In our view, Stafford's testimony that he had seen "prints and drawings of a similar model," together with the fact that the machine carried a model designation

mentioned in the 1955 approval, permitted, but did not require, a finding that the machine in question was substantially similar in design to what was approved in 1955. It was open to the judge permissibly to conclude that what might have been considered safe in 1955 was not relevant to what was required of the industry either in 1961 or in 1970. See and compare *Dominick* v. *Brockton-Taunton Gas Co.*, 356 Mass. 669, 671 (1970) ("The expert's testimony as to a safe method [of installation] referred to in a bulletin in 1963 had no relevance as to the [earlier] year the installation was made").

2. *Evidence of safety devices on other paper cutters.* The defendant argues that the judge erred in allowing the plaintiff's rebuttal witness to testify about the safety features present in a paper cutter which Milton Bradley had purchased in 1976.

The plaintiff's expert Paul had testified that two feasible methods of protecting a worker's hands during the clamping cycle when the Harris-Seybold machine was manufactured and at the time of the accident were a line of photoelectric cells which would turn the machine off when a hand entered the operating area, and a two-step clamping operation which would require the operator to remove his hands before full pressure was applied to the stack of paper.[11] As to the photoelectric cells, he testified that similar machines, including a metal shear, had utilized this technology since the 1940's. As to the two-step clamping device, he testified without objection that "it was used on other paper shears in the 1960 area." The plaintiff's other expert, Meagher, similarly testified that both photoelectric cells and the use of dual hand controls for the clamping bar were appropriate safety devices which could have prevented the plaintiff's injury. Both of the defendant's experts stated that neither the

[11] The witness testified that fifty to one hundred pounds of pressure would suffice to hold the paper in place, while a much greater pressure is necessary during the cutting cycle to shear the paper evenly. He also testified that fifty to one hundred pounds could not cause a serious injury to the hand.

photoelectric cells nor the two stage clamping device was feasible upon precision paper cutting machines because they would interfere with the work of the machine or not function as a guard. Barnett further asserted that such safety devices were impractical even at the date of the trial (1979) and that it would "amaze" him to learn of a functioning paper cutting machine with a photoelectric sensing mechanism. After a voir dire, the plaintiff was allowed to rebut this testimony through that of the director of safety for Milton Bradley (cf. *Griffin* v. *General Motors Corp.*, 380 Mass. 362, 364-365 [1980]), who testified that the company had purchased a precision paper cutting machine in 1976 from a West German manufacturer which was utilized by Milton Bradley for the same work as the defendant's machine and which properly functioned in cutting large quantities of materials. The machine incorporated as safety devices a line of photoelectric sensors and a limitation of fifty pounds of pressure on the preview clamping cycle which could be activated by the foot treadle. The bar clamped with greater force during the cutting cycle, which was activated by dual hand controls.

The judge immediately informed the jury that this evidence was admitted "as to whether such a device or devices would be feasible today and . . . on the question of the feasibility of design." She later instructed the jury during her general instructions that they were to consider "whether such features were feasible or available in 1961 when the machine was purchased or manufactured and in 1970 when the accident happened," stating that the testimony of the safety director did not cover that question.[12]

---

[12] She again limited consideration of the testimony of the rebuttal witness by stating: "At this point, I want to again instruct you that the testimony of the last witness before you who testified as to a machine which was obtained by Milton Bradley in 1976 was admitted for a limited purpose only. It was only marginally admissible because there was some evidence that certain safety features are not feasible, even today, and the evidence of that witness was admitted only on that question and which really isn't an issue in this case."

Where a plaintiff claims that a manufacturer's negligent design of a machine is the proximate cause of his injuries, material issues for the jury to decide include "the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Back* v. *Wickes*, 375 Mass. at 642, quoting from *Barker* v. *Lull Engr. Co.*, 20 Cal. 3d 413, 431 (1978). See also Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale L.J. 816, 851-852 (1962). Frequently, evidence as to feasibility of alternate designs comes to the attention of the jury through the testimony of an expert to the effect that competitive designs employing preferred safety devices were utilized for similar machinery at the time in question and were thus available to defendant. *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 878 n.4 (1978) (devices known to defendant, several of which were used by other manufacturers). *Bernier* v. *Boston Edison Co.*, 380 Mass. 372, 380 (1980) (steel hoops or spirals available since early 1900's to reinforce columns in buildings and could have been utilized in defendant's electric light poles). See also *Blohm* v. *Cardwell Mfg. Co.*, 380 F.2d 341, 342-344 (10th Cir. 1967) (devices in use by other manufacturers); *Larue* v. *National Union Elec. Corp.*, 571 F.2d 51, 57 (1st Cir. 1978) (model manufactured by same defendant for overseas use). Evidence concerning subsequent technological advances or safety improvements utilized by the same manufacturer either before or after the accident are similarly admissible in the discretion of the trial judge on the issues of feasibility and knowledge of the risk at the time of manufacture or the time of accident. *Bernier* v. *Boston Edison Co., supra* at 380. See *doCanto* v. *Ametek, Inc.*, 367 Mass. at 780, and cases cited; *Boeing Airplane Co.* v. *Brown*, 291 F.2d 310, 315-316 (9th Cir. 1961); *Gray* v. *General Motors Corp.*, 434 F.2d 110, 113-114 (8th Cir. 1970) (to show that technology was not available at crucial time); *Mahoney* v. *Roper-Wright Mfg. Co.*, 490 F.2d 229, 232 (7th Cir. 1973). See

generally Annot., Admissibility of Evidence of Subsequent Repairs or Other Remedial Measures in Products Liability Cases, 74 A.L.R. 3d 1001 (1976). Where a proper foundation has been laid, as here, a showing may be made either that the technology was available to utilize later safety features at the earlier date at issue or that other competitive machines had such features at the relevant date. See *Uloth* v. *City Tank Corp.*, *supra* at 878 n.4. ("Uloth presented testimony of numerous available safety devices . . . . Several of these devices were being used by other companies when [the machine at issue] was designed"). Where the technology is available, even the lack of availability of a safety device throughout an industry is not conclusive on the issue of feasibility, since, as Judge Learned Hand pointed out, "a whole calling may have unduly lagged in the adoption of new and available devices." *The T. J. Hooper*, 60 F.2d 737, 740 (2d Cir.), cert. denied sub nom. *Eastern Transp. Co.* v. *Northern Barge Corp.*, 287 U.S. 662 (1932). Under these standards, the judge did not err in allowing the jury to consider evidence pertaining to the 1976 machine on the issue of the feasibility of better safety devices in 1961 or 1970, for the defendant's product, because there was independent evidence presented by the plaintiff's expert Paul of such feasibility. Under the cases the evidence could have been admitted generally and not limited to a collateral point. Thus the limitations placed on the consideration of the evidence by the judge were more favorable than what the defendant was entitled to.

3. *Jury instructions.* Both parties requested that the judge give the jury certain instructions on design negligence drawn from the principles set forth in the decision of *Uloth* v. *City Tank Corp.*, 376 Mass. 874 (1978). The defendant contends that the judge erred by not specifically instructing the jury in keeping with that case that "[w]hen there is an allegation of negligent design the jury should consider the following factors: a. Did the product perform as intended. b. Were the dangers obvious." *Id.* at 881. The judge instructed the jury on the general principles of the law of

negligence and on the specific principles that apply to the theory of negligent design in a products liability case. Among other things, she told the jury that the defendant had a duty to design the machine with reasonable care to eliminate avoidable dangers, keeping in mind the environment in which it would be used. She told the jury that the machine should be "reasonably safe for [the] use and for the purposes for which it was intended." She also told the jury that in evaluating the adequacy of the design they could consider a variety of factors, including the "seriousness or gravity of the dangers to the user posed by the machine as it was designed," the mechanical feasibility and financial cost of an improved design, and "whether there was an available design modification which would have reduced the risk without undue cost or interference with the performance of the machine." It was pointed out to the jury as well that the defendant "is not required to design the safest possible product . . . [and] is not required to design against all possible risks, against every remotely possible danger or every imaginable danger." In addressing the issue of the plaintiff's voluntary assumption of the risk,[13] she told the jury, among other things, to consider what the plaintiff "himself, in fact, saw, knew, understood or appreciated [as to the gravity] of the risk involved."

A trial judge has wide latitude in framing the language to be used in instructions (*Commonwealth* v. *Kelley*, 359 Mass. 77, 92 [1971]), and the judge is not obliged to charge the jury in the specific language requested by a party. *Fialkow* v. *DeVoe Motors, Inc.*, 359 Mass. 569, 575 (1971). In testing the sufficiency of a charge, we will read it as a whole (*Posner* v. *Minsky*, 353 Mass. 656, 660 [1968]), to ascertain whether the judge has clearly, adequately, and correctly explained to the jury the principles that ought to guide and control their action (*Horowitz* v. *Bokron*, 337 Mass. 739,

---

[13] Because Torre's accident occurred on April 27, 1970, it is not affected by G. L. c. 231, § 85, as amended by St. 1973, c. 1123, which abolished assumption of the risk as a defense in cases arising out of accidents occurring after January 1, 1974.

746 [1958]; *Wilson* v. *Boston Redev. Authy.*, 366 Mass. 588, 591-592 [1975]), and a good objection will lie only if a critical issue was not dealt with at all or was dealt with erroneously as a matter of law. See *Potter* v. *John Bean Div. of Food Mach. & Chem. Corp.*, 344 Mass. 420, 425-427 (1962). The charge in this case adequately and understandably explained to the jury the law applicable to the issue of design negligence in accordance with the principles embodied in the *Uloth* decision. We are not persuaded that the instructions incorrectly defined or overstated the manufacturer's responsibilites. Neither are we convinced that the instructions left the jury without a working list of factors by which liability could be determined, or that the judge's explanation of the applicable law prejudicially clouded any of the defenses offered.

The order entered on February 14, 1978, allowing the plaintiff's motion for a new trial is affirmed. The judgment entered on March 27, 1979, on the jury verdict in the third jury trial is affirmed.

*So ordered.*