KALILA, COMMONWEALTH vs., 102 Mass. App. Ct. 108

 
 COMMONWEALTH vs. KHALID KALILA.

102 Mass. App. Ct. 108
 October 4, 2022 - January 11, 2023

Court Below: Massachusetts Appeals Court
Present: Meade, Milkey, & Massing, JJ.

 

Amended February 10, 2023.

No. 21-P-923.

Practice, Criminal, Execution of sentence, Stay of proceedings. Appeals Court, Appeal from order of single justice.

A single justice of the Appeals Court did not abuse his discretion in determining that a Superior Court judge had not abused his own considerable discretion in denying a criminal defendant's motion to stay the execution of his four- to five-year State prison sentence following the defendant's convictions of mayhem, assault and battery by means of a dangerous weapon, and violation of another's constitutional rights causing bodily injury, based on the judge's finding that, notwithstanding the asserted strength of the defendant's claim that he had been improperly prevented from exercising a peremptory challenge to a juror, the defendant posed a security risk if released pending appeal, i.e., a risk that the defendant, who was a dual citizen of the United States and Morocco with roots in both, would flee to Morocco to avoid punishment; nor did the single justice abuse his discretion to the extent he made an independent determination that the defendant posed a security risk if released. [112-120] Milkey, J., dissenting.

Indictments found and returned in the Superior Court Department on June 28, 2018. 

 A motion for a stay of execution of sentence, filed on May 24, 2021, was heard by Michael D. Ricciuti, J., and a second motion for a stay of execution of sentence was heard in the Appeals Court by Desmond, J. 

 J.W. Carney, Jr., for the defendant.

 Darcy A. Jordan, Assistant District Attorney (Lynn Feigenbaum, Assistant District Attorney, also present) for the Commonwealth.

 MASSING, J. Convicted after a jury trial on indictments charging mayhem, assault and battery by means of a dangerous weapon, and violation of another's constitutional rights causing bodily injury, the defendant, Khalid Kalila, appeals from the denial of his request for the stay of his sentence pending appeal. Ultimately, this appeal turns on whether a single justice of this court 

 Page 109 

abused his discretion in affirming the trial judge's finding that the defendant posed a security risk if released pending appeal -- specifically, a risk that the defendant, a dual citizen of the United States and Morocco with roots in both, would flee to Morocco to avoid punishment. Concluding that the single justice did not abuse his discretion, notwithstanding the asserted strength of the defendant's claim that he was improperly prevented from exercising a peremptory challenge, we affirm.

 Background. 1. The crime. On January 30, 2018, the defendant and his brother, accompanied by two friends, went out for drinks to celebrate learning that the brothers' spouses were pregnant. Their night on the town ended at a restaurant and lounge located in the Seaport area of Boston, where the defendant got involved in an altercation with another patron. As security personnel sought to remove the defendant from the premises, the defendant struck one of them two or three times with a glass he was holding in his hand, all the while yelling racial epithets and threats at the victim, who was Black. The victim was taken to the hospital with shards of glass embedded in his face, requiring over seventy stitches and plastic surgery. As a result of the attack, the victim sustained loss of vision in his left eye, nerve damage to the left side of his face, and permanent scarring. 

 2. Pretrial release. The defendant was arrested and subsequently released on $10,000 cash bail, with conditions that he have no contact with the victim and stay away from the restaurant. Over the next three years the defendant abided by the conditions of his release, remained gainfully employed, and never missed a court date.

 3. The peremptory challenge. The appellate issue in this case concerns the trial judge's refusal to permit the defendant to exercise a peremptory challenge to remove a Black member of the venire. Juror no. 32 was a thirty-six year old man whose mother worked for the Boston Police Department in a civilian role in the internal affairs division (IAD). Neither party sought to remove the juror for cause. When defense counsel exercised a peremptory challenge, the judge, sua sponte, asked counsel the reason for the challenge. Counsel said that the strike was based on the juror's mother's employment with the police, which "would create, I think, a bad situation if we are challenging the credibility of the Boston Police." 

 The judge rejected the strike. The judge did not find that counsel's given reason was pretextual; indeed, the judge made it 

 Page 110 

clear that he believed that the reason was "genuine." Rather, the judge determined that the reason given was not "adequate." The judge found that the juror was impartial and that his mother's work would not affect his assessment of witness testimony. [Note 1] Defense counsel responded that the judge's reasoning was relevant to a challenge for cause, but not to the adequacy of the reason given for a peremptory challenge. The judge maintained, "I find your reason is genuine, I don't find it's adequate," and disallowed the strike. [Note 2] Juror no. 32 ultimately sat on the jury that deliberated and found the defendant guilty.

 When the defendant moved to strike juror no. 32, four jurors, including a Black woman, had been seated. The defendant had previously used one peremptory challenge to strike a white juror. Besides juror no. 32, the defendant exercised five peremptory challenges, striking four white women and one white man. The deliberating jury ultimately consisted of five Black jurors and nine white jurors. Deliberations began on the afternoon of the seventh day of trial and continued during the eighth and ninth days. The jurors were excused early on the afternoon of the ninth day because a juror was feeling sick. The guilty verdicts were announced shortly after 11 A.M. on the tenth day. 

 4. Trial judge's denial of the stay. After his conviction, the defendant filed a motion for a stay of execution of the sentence. He argued that he had a reasonable possibility of success on appeal based on the denial of his peremptory challenge, and that he was not a flight risk and did not pose a threat to commit another crime or otherwise endanger the community. He suggested that the $10,000 bail he had previously posted remain in place, and offered to "surrender his passports to the probation department within [twenty-four] hours of his release." 

 While the judge agreed that the appellate issue presented an adequate likelihood of success, he found that the defendant 

 Page 111 

presented a "profound" risk of flight because he had strong family ties to Morocco: 

"[The defendant] is an extreme risk of flight to Morocco. He was born there and is a dual citizen of the United States and Morocco, having emigrated to the United States in 2003. He met his wife in Morocco, showing that she, too, has strong ties there. [The defendant] has routinely taken his wife and children to Morocco in the past, showing that he is able to bring his entire family, including small children (now aged [five], [two] and [ten] months), overseas and escape punishment. Indeed, [the defendant] has regularly taken his wife and children to spend summers in Morocco; escaping there now would appear consistent with this routine. Further, [the defendant]'s father lives in Morocco, having moved back to Morocco from the United States after his wife died, illustrating the continued pull of life in Morocco on [the defendant] and his extended family. Additionally, [the defendant] and his brothers, who are very close, 'take time to visit their father in Morocco' . . . . Fleeing to Morocco thus would not cut [the defendant]'s family ties, it would enhance them." (Footnote omitted.)

 Having observed the defendant testify at trial, the judge "found his testimony to be incredible," and "thus [found] that it is impossible to rely on his representations that he will not seek to flee." Moreover, the judge further found, the defendant appeared to have the financial resources to do so: he "posted $10,000 bail on the night of his arrest, has been regularly employed in a management job (director of facilities for [a large property management company]), has a history of regularly taking expensive foreign trips, and is represented by private counsel." 

 The judge acknowledged that the defendant had complied with the conditions of pretrial release and had appeared for trial, but found that the conviction altered his incentives:

"Even though [the defendant] complied with release conditions and appeared at trial, the facts are now markedly different; [the defendant] knows his defense failed and he must serve [four] to [five] years in prison, such that the incentive to flee has grown far stronger than prior to the verdict. Escaping would be a rash and impulsive act, but one generally consistent with the trial evidence, even if [the defendant]'s 

 Page 112 

counsel has informed him that counsel is confident the verdict will be reversed."

 5. Single justice's denial of the stay. The defendant next sought a stay pending appeal in this court under Mass. R. A. P. 6, as appearing in 481 Mass. 1608 (2019). The single justice saw no error or abuse of discretion in the trial judge's decision to deny the stay. With respect to the likelihood of success factor, the single justice agreed with the trial judge that the defendant's peremptory challenge claim was sufficient. With respect to risk of flight, the single justice reviewed the facts that the trial judge had considered -- including the defendant's minimal criminal history, the letters submitted to the trial judge showing community support for the defendant, and the fact that the defendant complied with all of the conditions of his pretrial release -- and determined that the judge's assessment of the security risk was reasonable. [Note 3] Having concluded that the trial judge did not abuse his discretion in denying the stay, the single justice stated, "[A]fter exercising my independent review and discretion, I reach the same conclusion here." 

 Discussion. 1. Review of trial judge's denial of the stay. We need not engage in a lengthy recitation of the standard for deciding whether to stay a criminal sentence pending the defendant's appeal from the judgments of conviction; the standard is set forth in detail in Commonwealth v. Nash, 486 Mass. 394, 402-412 (2020), and the cases cited therein. To summarize, "Under the traditional, pre-[COVID-19] pandemic standard . . . a defendant bears the burden of proving two factors -- likelihood of success on appeal and security -- in order to prevail." Id. at 406. Additional considerations come into play to address the consequences of the COVID-19 pandemic for incarcerated individuals. See id. at 406-409; Christie v. Commonwealth, 484 Mass. 397, 401-402 (2020). The defendant did not raise any issues concerning COVID-19 in his motion to stay before the trial judge or the single justice, and he does not press the issue on appeal.

 a. Likelihood of success on appeal. The first factor in the traditional test -- a reasonable likelihood of success on appeal -- is not at issue here. The trial judge, the single justice, and all 

 Page 113 

members of this panel agree that the defendant's peremptory challenge issue has "sufficient heft that would give an appellate court pause." Nash, 486 Mass. at 404. Thus, this appeal comes down to whether the single justice made an error of law or abused his discretion either (1) in determining that the trial judge did not make an error of law or abuse his discretion in finding that the defendant posed a flight risk, or (2) in making his own independent determination that the defendant posed a flight risk. See id. at 412. 

 Because the defendant bears the burden of showing both a meritorious appellate issue on appeal and that he would not pose a security risk if released, the strength of the defendant's showing on the former does not affect the defendant's burden of proving the latter. "[W]hen a denial by a single justice of a stay of execution pending appeal is predicated, in whole or in part, on reasons of security, the denial should not be disturbed on appeal unless the defendant can demonstrate abuse of discretion." Commonwealth v. Levin, 7 Mass. App. Ct. 501, 506 (1979). See Commonwealth v. McDermott, 488 Mass. 169, 173 (2021) (affirming denial of stay pending appeal from denial of new trial motion, notwithstanding meritorious appellate issue and COVID-19 factor, "because we agree that the defendant presents a serious flight risk"); Commonwealth v. Dame, 473 Mass. 524, 539, cert. denied, 580 U.S. 857 (2016) ("The [security] consideration alone supports denial of the motion"); Commonwealth v. Springfield Terminal Ry. Co., 77 Mass. App. Ct. 225, 230 (2010) ("Because the defendants have failed to demonstrate that the single justice abused her discretion in denying the motion for security reasons, we need not decide whether the appellate issues they raise offer some reasonable possibility of a successful decision on appeal").

 We do not read the Nash decision as signaling a new approach to the traditional two-factor test. In Nash, 486 Mass. at 405-406, the court explained why it created "the COVID-19 factor" in Christie, 484 Mass. at 401-402. "[I]n order to address the unique, potentially deadly consequences that COVID-19 presents for individuals in our prisons and jails," and "to reduce temporarily the prison and jail populations, in a safe and responsible manner, through the judicious use of stays of execution of sentences pending appeal," the court added COVID-19 as "another variable for judges to consider when deciding whether to stay a defendant's sentence pending appeal." Nash, supra. The addition of COVID-19 considerations to the traditional test for evaluating 

 Page 114 

motions to stay sentences pending appeal was meant as a remedy for "extraordinary times." Id. at 406, quoting Christie, supra at 401.

 The court's discussion of how COVID-19 affects the traditional test illustrates the point. The court posited a situation in which a defendant is able to satisfy the security test but has a weak appellate issue that would not satisfy the likelihood of success test. "Under the traditional two-factor test, the judge would not grant a stay in that situation." Nash, 486 Mass. at 407. The judge might, however, decide to grant a stay notwithstanding the weak appellate issue after considering the COVID-19 factor in the totality of the circumstances. See id. at 407 & n.17. [Note 4] The COVID-19 concerns are thus said to "buttress deficient motions to stay the execution of a sentence." McDermott, 488 Mass. at 170.

 Therefore, as a matter of law, where, as here, COVID-19 considerations are not a factor, it cannot be an abuse of discretion for the trial judge (or the single justice) not to consider the strength of the defendant's appellate issue in determining whether the defendant posed a serious flight risk. We reserve for later discussion the defendant's contention that the nature of the error and his likelihood of prevailing, as a matter of fact, reduced the security concerns. 

 b. Flight risk. Turning to the security factor, "[s]ignificant considerations include the defendant's 'familial status, roots in the community, employment, prior criminal record, and general attitude and demeanor.'" Commonwealth v. Charles, 466 Mass. 63, 77 (2013), quoting Commonwealth v. Hodge (No. 1), 380 Mass. 851, 855 (1980). These considerations "inform the calculus regarding the possibility of the defendant's flight to avoid punishment," as well as danger to the community and the likelihood of the defendant committing additional crimes. Charles, supra. "The judge also may consider the seriousness of the crime of which the defendant was convicted, the strength of the evidence presented 

 Page 115 

at trial, and the severity of the sentence that the judge imposed." Nash, 486 Mass. at 405.

 In performing appellate review, this court must bear in mind that both the trial judge's and the single justice's determinations involve factual findings. "They require the judge to employ his or her 'sound, practical judgment and common sense,' to decide based on the available information whether the defendant will be a danger or a flight risk if at liberty during the pendency of the appeal. The judge has considerable leeway in making that determination." Nash, 486 Mass. at 405, quoting Levin, 7 Mass. App. Ct. at 505. It also bears emphasis that in conducting appellate review under the abuse of discretion standard, we do not substitute our judgment for that of the motion judge or the single justice. See Nash, supra at 412; Commonwealth v. Dilworth, 485 Mass. 1001, 1002 (2020); Boulter-Hedley v. Boulter, 429 Mass. 808, 811 (1999). "An appellate court's review of a trial judge's decision for abuse of discretion must give great deference to the judge's exercise of discretion; it is plainly not an abuse of discretion simply because a reviewing court would have reached a different result." L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

 The trial judge assessed the defendant's credibility and demeanor at trial and concluded that, notwithstanding the defendant's minimal criminal history and compliance with all of the conditions of his pretrial release, now facing a four- to five-year State prison sentence, "the [defendant's] incentive to flee has grown far stronger than prior to the verdict." [Note 5] The defendant primarily takes issue with the trial judge's finding that the defendant had the financial resources to flee overseas. In making this finding, the judge relied heavily on the defendant's posttrial sentencing memorandum, which indeed painted a picture of comfort, if not affluence. The memorandum stated that, growing up, the defendant and his three brothers "spent summers on the beaches of Morocco and holidays with extended family." With three of the brothers now living in the United States, they visit their 

 Page 116 

other brother in Germany "at least once a year" and "also take time to visit their father in Morocco." The defendant's memorandum also described his "lengthy history of stable employment," most recently in a high-level management position overseeing sixty maintenance employees and nine properties, including 2,500 residential apartments and a golf course. 

 The trial judge may have placed undue reliance on the fact that the defendant retained private counsel. While this does suggest that the defendant had sufficient means to pay an attorney, by the same token, the attorney's fees may have reduced his disposable income. Nonetheless, given the facts set forth by the defendant in his own memorandum, and the trial judge's opportunity to assess the defendant's demeanor and credibility during the trial, the single justice did not abuse his discretion in concluding that the trial judge's assessment of the defendant's financial resources and incentive to flee to Morocco did not manifest "a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives." Garcia v. Commonwealth, 486 Mass. 341, 348 (2020), quoting L.L., 470 Mass. at 185 n.27.

 Likewise, the trial judge reasonably did not put faith in the defendant's offer to turn over his active United States and expired Moroccan passports, and the single justice did not abuse his discretion in accepting the trial judge's skepticism. The trial judge reasoned that it would be quite possible for the defendant to replace his Moroccan passport without its renewal coming to the attention of the United States and Massachusetts authorities. The defendant's response that he would have to present his passport to the Transportation Security Administration before boarding a flight does not address the trial judge's concern, which was within the range of reasonableness.

 In any event, although a judge may impose conditions on a stay pending appeal under Mass. R. Crim. P. 31 (b), as appearing in 454 Mass. 1501 (2009), tailored to address the judge's concerns about the defendant's security risks, see Commonwealth v. Beauchemin, 410 Mass. 181, 186 (1991), a judge has no obligation to impose the least restrictive conditions that will reasonably prevent flight or protect the community. Such considerations are paramount when a judge acts on a motion for pretrial detention under G. L. c. 276, § 58A, to preserve the presumption of innocence. See Brangan v. Commonwealth, 477 Mass. 691, 692 (2017). But a defendant seeking a stay of a sentence pending 

 Page 117 

appeal no longer enjoys the presumption of innocence and is not entitled to the same protections as a defendant seeking to be released on bail prior to trial. "[A] defendant is no longer presumed innocent after a conviction; rather a convicted defendant is presumed guilty despite the pendency of an appeal, and the conviction is presumed to have been validly obtained." Commonwealth v. Hernandez, 481 Mass. 582, 594595 (2019), quoting State v. Carlin, 249 P.3d 752, 762 (Alaska 2011). [Note 6]

 Finally, we address the defendant's contention that the trial judge abused his discretion by failing to consider that "[t]he likelihood of reversal incentivizes the defendant to remain in Massachusetts while his appeal is pending" because the defendant can be confident that he will succeed on appeal and the appellate court will "vacate his conviction and sentence." Even if we assume for the purposes of this appeal that the defendant is likely to succeed on his peremptory challenge claim, we discern no abuse of discretion in the single justice's acceptance of the trial judge's implicit rejection of the defendant's premise that his prospects of success reduced his risk of flight.

 The defendant's appellate issue is not one of the few claims, such as sufficiency of the evidence, that require the entry of a judgment of acquittal. The best outcome the defendant can hope for is a new trial before another finder of fact. The trial judge could reasonably conclude that, were the defendant released pending appeal, the defendant would present a risk of flight in order to avoid, and not merely postpone, punishment. 

 The fact that the improper denial of a defendant's peremptory challenge is a "structural error" does not make a difference. Although structural errors often implicate "fundamental defects in a trial," Commonwealth v. Hampton, 457 Mass. 152, 163 (2010), the term has "no talismanic significance." Weaver v. Massachusetts, 137 S. Ct. 1899, 1910 (2017). The underlying error here 

 Page 118 

-- preventing the defendant from using a peremptory challenge to strike an impartial juror -- does not affect the defendant's State or Federal constitutional rights. See Rivera v. Illinois, 556 U.S. 148, 157 (2009); Commonwealth v. Wood, 389 Mass. 552, 559 (1983). Indeed, in Rivera, supra at 162, a unanimous United States Supreme Court recognized that even if a defendant was denied the exercise of a peremptory challenge to which he was entitled, the result would be "the improper seating of a competent and unbiased juror." Thus, the trial judge's refusal to allow the defendant to exercise the peremptory challenge "did not deprive [the defendant] of his constitutional right to a fair trial before an impartial jury." Id. at 158. Given the absence of a constitutional deprivation, the Court left it to the States to decide, as a matter of State law, whether "a trial court's mistaken denial of a peremptory challenge is reversible error per se." Id. at 162.

 In Massachusetts, "[w]e continue to adhere to the view that, for purposes of State law, the erroneous denial of a peremptory challenge requires automatic reversal, without a showing of prejudice." Hampton, 457 Mass. at 164. Our view is based in part on the ground that, as argued in Rivera, 556 U.S. at 157, "[t]he improper seating of a juror . . . is not amenable to harmless-error analysis because it is impossible to ascertain how a properly constituted jury -- here, one without juror [no. 32] -- would have decided [the] case." [Note 7] See Commonwealth v. A Juvenile, 384 Mass. 390, 393 (1981) ("where actual prejudice is impossible to establish and where the right denied is substantial, we have reversed convictions without requiring a defendant to show actual prejudice"). Even if the defendant is entitled to a new jury trial, the nature of the error gives him no reasonable expectation of an acquittal -- or any less incentive to flee. 

 Based on the foregoing considerations, we conclude that the single justice did not abuse his discretion in determining that the trial judge did not abuse his considerable discretion in denying the stay.

 2. Review of single justice's exercise of "independent" review. When a defendant renews a motion for a stay in the appellate court, the single justice may choose to operate in "'appellate' mode," reviewing only to determine whether the trial judge made 

 Page 119 

an error of law or abused his or her discretion. Nash, 486 Mass. at 410. In the alternative, the single justice may conduct an "independent assessment of the defendant's motion." Id. "Under this option, the single justice rules on the matter as if ruling on the request for a stay in the first instance, and the defendant thus truly has a second bite at the apple." Id. Sometimes single justices operate in what might be called a "hybrid" mode. That is, they "employ both standards in an effort to cover all the bases; they say that the trial judge did not commit an abuse of discretion when he or she denied the stay and, further, that they have also considered the matter anew and likewise decline to grant a stay." Id. at 410-411.

 In this case, the single justice's decision denying the stay was written primarily in the appellate mode. He ended his decision by shifting to the hybrid mode, stating that "after exercising [his] independent review and discretion," he reached the same conclusion as the trial judge. He gave no indication that he intended to review the defendant's motion as if the proceedings in the trial court had not occurred. He did not invite the defendant to submit supplemental materials, and he did not hold a hearing. Nonetheless, in his renewed motion before the single justice, the defendant included two affidavits that he had not submitted to the trial judge: the affidavit of his wife, which stated that the defendant and his family had only $7,000 in savings and lacked the financial resources to relocate to Morocco, and the affidavit of his brother. [Note 8] The single justice's written findings gave no indication whether he considered these materials. 

 A single justice "has the power to consider the matter anew, taking into account facts newly presented, and to exercise his own judgment and discretion" to grant a stay. Hodge, 380 Mass. at 854, quoting Commonwealth v. Allen, 378 Mass. 489, 496 (1979). Although the single justice may consider newly presented material, there is no obligation to do so. And if the single justice did consider the defendant's wife's affidavit, he would have been free to discredit it given the close relationship between the defendant and his wife. See Commonwealth v. Toney, 385 Mass. 575, 580 (1982). Even if the single justice was required to consider the affidavit and merely overlooked it, a remand for him to reconsider 

 Page 120 

it, as in Commonwealth v. Lys, 481 Mass. 1, 5-7 (2018), would not be productive here. We have already concluded that the single justice did not abuse his discretion in determining that the trial judge acted within his discretion in denying the stay. We likewise conclude that the single justice did not abuse his discretion to the extent he made an independent determination that the defendant posed a security risk if released.

 Conclusion. We affirm the order of the single justice denying the defendant's motion for a stay of the execution of his sentence pending appeal.

 So ordered.

 MILKEY, J. (dissenting). In my view, the majority's analysis is at odds with the teachings of Commonwealth v. Nash, 486 Mass. 394 (2020), the seminal case governing motions to stay execution of sentences pending appeal. In fact, the defendant before us has presented a far stronger case for his release pending appeal than the defendant did in Nash. For the reasons detailed below, I believe this case provides a vivid example of the institutional inertia that keeps people incarcerated even when they have demonstrated that their convictions likely will be vacated, and that their continued detention pending appeal serves no legitimate purpose. I therefore respectfully dissent.

 Background. 1. The defendant's circumstances. Because the defendant had an American mother and Moroccan father, he enjoys dual citizenship. He was born in Morocco, but moved to the United States with his family when he was fourteen. The family settled in Revere, where the defendant lived for the next two decades. He graduated from Revere High School, and entered the workforce as a building maintenance employee, while completing technical school concurrently with his full-time job. He succeeded in the building maintenance field to the extent that he rose to management positions at large real estate management firms. 

 The defendant married his middle-school sweetheart, and he and his wife -- a self-described "immigrant of Black African descent" -- had three children. As the trial judge observed, the defendant is part of a very close-knit family, and he is particularly close to his brothers. Indeed, up until recently, the defendant lived on one floor of a triple-decker home in Revere, with two of his 

 Page 121 

three brothers living on the other floors, together with their own families. A year before trial, the defendant moved to Burlington to a house where one brother and his family also reside, with a second brother living close by in Lexington. The brothers' "families spend practically every holiday, weekend, and day with each other." The remaining brother moved to Germany in 2018, but he came to the defendant's trial to show his support. [Note Milkey-1] 

 As evidenced by the forty-five letters of support submitted by friends, neighbors, colleagues, and family members on his behalf for sentencing, the defendant is richly embedded in his community. The letters attested to his strong character and to various good deeds he regularly performed. As but one of many examples, two letters praised how during an emergency evacuation of an apartment building in the Prudential Center that followed the Boston Marathon bombing, the defendant carried a wheelchair-bound woman down seventeen flights of stairs. The judge himself characterized the ten representative letters provided to him as follows: "[t]hey describe a man of peace, of charity, of good will toward all, regardless of race or background, kindness, helpfulness, warmth, patience." In the context of noting the contrast between the portrait of the defendant drawn by the letters of support and that depicted by the Commonwealth's evidence with respect to the incident for which the defendant was convicted, the trial judge credited that the defendant has "led what appears to [the judge] to be an unblemished life raising a family and participating meaningfully in the community." Apart from the charges at issue in this case, the defendant had what the judge characterized as only "a minimal criminal record (a juvenile [continuance without a finding] for assault and battery in 2005 [when the defendant was sixteen years old])." 

 While living what might be called the "American dream," the defendant kept some ties to the country of his birth. Specifically, he and his family periodically visited extended family members in Morocco in what the judge described as "recreational" trips. The defendant maintained his dual citizenship, but let his Moroccan passport lapse. In 2016, after the defendant's mother died, his father moved back to Morocco. 

 2. Pretrial release. Despite the defendant's dual citizenship and 

 Page 122 

the ties he maintained to Morocco, he was released pretrial on $10,000 bail, subject to various conditions such as his staying away from the victim. Because of delays caused by the COVID-19 pandemic, the pretrial period lasted over three years. Throughout that extended period, the defendant attended every court hearing and abided by all pretrial conditions of release. Meanwhile, he continued to thrive in the community. For example, while he was on pretrial release, not only did he retain his job, but his employer also promoted him further. By the time of trial, he served as "director of facilities" at a large property management firm, a position that the majority has characterized as a "high-level management position overseeing sixty maintenance employees and nine properties, including 2,500 residential apartments and a golf course." Ante at 116. Counsel relayed to the judge that the defendant's employer had told him that despite the guilty verdicts, he could retain his job if released pending appeal. 

 3. The underlying criminal case. As the majority notes, the incident for which the defendant was charged and convicted took place at a crowded restaurant where he and one of his brothers had gone to celebrate the news that each of their wives was pregnant. An altercation ensued after the defendant apparently stepped on another person's foot. According to the trial evidence, as several employees were escorting the defendant out of the restaurant, he struck one of the employees at least twice with the drinking glass he was holding, thereby causing serious permanent facial damage. It was undisputed that the entire frenzied event -- described by one restaurant employee as "such a blur" -- took less than a minute. 

 With these basic facts undisputed, the trial was over whether the Commonwealth could prove all of the elements of the particular offenses charged, and whether there were mitigating or aggravating circumstances. For example, the key disputed issue with respect to mayhem -- the most serious charge that the defendant faced -- was whether the Commonwealth could prove that the defendant acted with a specific "malicious intent to maim or disfigure." Commonwealth v. Forbes, 86 Mass. App. Ct. 197, 198-199 (2014), quoting G. L. c. 265, § 14. A conviction of mayhem cannot be sustained where a "defendant acted on the spur of the moment" and "it is [not] apparent from the context of the confrontation that the defendant intended to disfigure." Commonwealth v. Cleary, 41 Mass. App. Ct. 214, 215-216 (1996) (mayhem conviction based on defendant's striking victim with axe in context of bar fight reversed on sufficiency grounds). 

 Page 123 

 Another hotly contested issue at trial was whether the defendant uttered racial slurs during the altercation. This was critical to the charge that the defendant had violated the victim's civil rights, but also potentially relevant to whether the defendant acted with the requisite intent with regard to the other charges. The trial evidence regarding the alleged racial slurs was notably mixed. Eight witnesses who personally observed the altercation testified on the issue. [Note Milkey-2] Four witnesses testified either that the defendant did not utter any slurs or that they did not hear him do so, including one employee who was at the very center of the melee restraining the defendant while the events unfolded. Although four witnesses testified that they heard the defendant utter the slurs, not one of them reported this to the police officers who responded to the fight. During their lengthy deliberations, the jury asked whether the use of "racially charged language or racial motivation [was] a necessary element" of the civil rights indictment, and for reinstruction on what intent was necessary to prove mayhem. On the fourth day of deliberations, the jury found the defendant guilty of all charges. 

 4. Facts relevant to jury selection. As the majority recounts, the judge sua sponte refused to allow the defendant to exercise a peremptory challenge to a juror who was the son of an employee of the Boston Police Department, the very police department that had investigated the incident and whose members would testify at trial. The judge did this even though -- as he repeatedly noted -- he found that defense counsel was "genuine" in making the challenge, and was not raising it based on the juror's race (Black). He reasoned that he (the judge) was satisfied that the juror could be impartial and that counsel's explanation for the strike was not adequate (even though it was based on facts specific to this juror's ability to remain impartial that were unrelated to race). The defendant strenuously objected. 

 5. The stay proceedings. At sentencing, the judge deferred consideration of the defendant's motion to stay execution of his sentence. At the subsequent hearing on the stay motion, the defendant highlighted a particular juror selection case that involved markedly similar facts. See Commonwealth v. Gonzalez, 99 Mass. App. Ct. 161, 162-164, 167-168 (2021) (where trial judge 

 Page 124 

determined that peremptory challenge was not raised as sham and was based on adequate race-neutral reasons -- including that juror had cousins working for police department that arrested defendant -- judge committed structural error by disallowing challenge). With Gonzalez seemingly directly on point, the judge acknowledged what could not be denied: the defendant had demonstrated an issue "that would be taken seriously by the Appeals Court." 

 Nevertheless, the judge denied the defendant's motion after concluding that the defendant presented an "extreme risk of flight." The judge explained his reasoning in a five-page memorandum of decision, which adopted the oral findings he had made from the bench. In short, the judge concluded that having been sentenced to a multiyear prison term, the defendant now faced a strong incentive to flee; that his dual citizenship and ties to Morocco provided him the opportunity and means of doing so; and that the defendant had not proved that alternative measures would guarantee that he would not flee. Relying on essentially the same reasoning, a single justice of this court affirmed. Additional details of the reasoning employed by the trial judge and single justice are reserved for later discussion. 

 Discussion. 1. The standard of review. I begin by discussing the standard of review, because the majority itself identifies this as the basis on which this case "[u]ltimately . . . turns." Ante at 108. The majority correctly observes that our review of the single justice's decision is limited to whether he abused his discretion. "An abuse of discretion exists where a judge [made] 'a clear error of judgment in weighing the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives.'" Garcia v. Commonwealth, 486 Mass. 341, 348 (2020), quoting L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

 The question is how that standard is to be applied in the context of motions to stay execution of a sentence pending appeal. Citing Nash, the majority adopts a decidedly hands-off approach. In essence, the majority suggests that we must defer to a finding that a defendant presents a flight risk so long as there is a rational basis for that finding that enjoys some grounding in the evidence. That position is out of step with recent Supreme Judicial Court precedent applying the abuse of discretion standard in this context, most notably Nash itself.

 In Nash, 486 Mass. at 396, the jury had found a defendant guilty of particularly heinous crimes: raping an unconscious victim vaginally and anally, all while recording the rapes on video. 

 Page 125 

Focusing on the undeniable seriousness of those offenses and the lengthy sentences that the defendant received, the single justice unsurprisingly found that the defendant posed security risks that justified his detention pending appeal. See id. at 413-414. Her explanation was just as thoughtful as the one before us today.

 On appeal, the Supreme Judicial Court concluded that the defendant had put forward appellate arguments strong enough to satisfy the first prong of the applicable three-part stay test, "even if barely so." Nash, 486 Mass. at 413. With respect to the security issues, the court recognized that such issues primarily concern questions of fact on which the defendant bears the burden of proof. See id. at 405-406. It also noted that single justices have "considerable leeway" on such issues. Id. at 405. Despite this, and the undeniably "odious" nature of the crimes, the court unanimously ruled that the single justice abused her discretion in evaluating the security concerns that the defendant posed. Id. at 414. In doing so, the court did not confine its analysis to whether the single justice applied the correct legal test; instead, the court disagreed with how the single justice weighed the relevant factors. Specifically, the court held that the single justice gave too much weight to "the serious and abhorrent nature of [the] crimes," and not enough "weight to several other facts that go into the mix of security factors." Id. Of particular relevance here, the court concluded that the factors that the single justice undervalued included

"that the defendant had no prior criminal history . . .; his offenses were out of character and completely inconsistent with his personal history; he had deep roots in his community and the continued support of his wife (the victim's sister), with whom he was living, and numerous friends and family members; and he was released on bail before trial, appeared on all of his scheduled court dates, and abided by all the terms of his release." 

Id.

 The majority accurately quotes Nash, but fails to take into account its lessons for assessing the "range of reasonable alternatives" that set the benchmark for whether a judge has abused his or her discretion. Garcia, 486 Mass. at 348. While Nash does not create a firm presumption that a defendant who has raised an issue worthy of appeal is entitled to his release pending that appeal, it plainly signals the Supreme Judicial Court's expectation 

 Page 126 

that denials of motions to stay will be subjected to renewed scrutiny. I say "renewed" because, in my view, Nash does not create novel law so much as it returns to principles recognized by earlier cases. Notably, Nash repeatedly cites with approval a foundational case from our court that recognizes that under "customary and long-standing practice," stays of execution are granted where a defendant has raised an issue worthy of appeal "unless the granting of such a stay poses risks which cannot adequately be dealt with through the mechanism of bail." [Note Milkey-3] Commonwealth v. Levin, 7 Mass. App. Ct. 501, 512 (1979). [Note Milkey-4] 

 With this background in place, I turn to how the trial judge and single justice handled the first two prongs of the three-part test set forth in Nash. [Note Milkey-5] As the majority accurately notes, the third prong (regarding COVID-19 risks) is not at issue in this appeal. 

 Page 127 

 2. The merits of the defendant's appeal. The defendant has raised an appellate issue that is far stronger than the one in Nash, which the court described as "barely" worthy of appeal. Nash, 486 Mass. at 413. Of course, it is not this panel's role to reach a definitive resolution of the merits of the defendant's appeal in chief. That task will fall to a subsequent panel. That said, I see no impropriety in pointing out that -- armed with a case seemingly directly on point -- the defendant has presented an exceptionally strong argument that in denying his peremptory challenge, the trial judge committed a structural error that will require his convictions to be vacated on appeal. [Note Milkey-6] Faced with that argument, the Commonwealth has not to date made any effort whatsoever to explain how affirming the convictions might be possible. [Note Milkey-7] For all that appears before us, the Commonwealth may intend to confess error when it eventually files its brief in the case-in-chief.

 Rather than engage the merits, the Commonwealth asserts that because it has conceded that the defendant has raised an issue "worthy" of appeal, the strength of his arguments beyond that decidedly low threshold is irrelevant for purposes of assessing whether he should be released pending appeal. In other words, the Commonwealth suggests that merely by conceding that a defendant has satisfied the first prong of the three-part test, it gets to remove from consideration whether a defendant may have shown that his conviction almost certainly will be vacated. The majority quietly endorses the Commonwealth's position, content as it is to pass over an examination of the merits on the ground that the first factor is not contested. [Note Milkey-8] In my view, the Commonwealth's approach is not only wrong, but perverse.

 Page 128 

 To be clear, I am not suggesting that in evaluating whether to grant a stay of execution, a trial judge (or single justice) is obligated to determine the precise degree of merit in a defendant's appellate arguments. Nevertheless, it cannot be that where a defendant has shown that his conviction is infected with obvious structural error warranting reversal, this becomes irrelevant to the stay question just because the Commonwealth desires to avoid this discussion. After all, whether execution of a sentence should be stayed ultimately comes down to a balancing of the defendant's rights and the legitimate security concerns of the public. See Levin, 7 Mass. App. Ct. at 512-513. It stands to reason that the stronger a defendant's appellate arguments, the more the balance favors the defendant's release pending the appeal. [Note Milkey-9] 

 3. Security concerns. The majority emphasizes that if a defendant poses sufficiently strong security concerns, his motion to stay execution of his sentence can be denied on this ground alone. I do not dispute that point, which the Supreme Judicial Court recently reaffirmed in a post-Nash case. See Commonwealth v. McDermott, 488 Mass. 169, 172-173 (2021) (where defendant already had spent four decades in prison for murder, and was "still facing a life sentence," risk of flight justified his continued detainment pending appeal). It thus follows that if the defendant in fact presents an "extreme risk of flight" that could not be addressed by imposing conditions of release, then the denial of his requested stay would be warranted. I therefore turn to those issues.

 The seriousness of a crime and the length of the resulting sentence are of course among the factors that a judge can consider in determining what security risks the release of a defendant would pose. See Nash, 486 Mass. at 405. It is indisputable, however, that other "[s]ignificant considerations include the defendant's 'familial status, roots in the community, employment, 

 Page 129 

prior criminal record, and general attitude and demeanor.'" Commonwealth v. Charles, 466 Mass. 63, 77 (2013), quoting Commonwealth v. Hodge (No. 1), 380 Mass. 851, 855 (1980). Such considerations "inform the calculus regarding the possibility of the defendant's flight to avoid punishment," as well as any danger to the community and the likelihood of the defendant committing additional crimes. Charles, supra. All these considerations strongly favor the defendant here. For example, as in Nash, supra at 414, the crime at issue here was "out of character and completely inconsistent with [the defendant's] personal history," as the judge himself observed. In fact, as detailed in the background set forth above, these undervalued considerations apply with significantly greater force than they did in Nash. Yet, to the extent that the judge discussed these factors at all, he made only perfunctory mention, and then in conclusory fashion dismissed them as overwhelmed by the defendant's strong incentives to flee. 

 What is most salient about the trial judge's explanation of why the defendant poses an "extreme risk of flight" is what is missing from his analysis. In particular, nowhere in his oral findings at the motion hearing or his memorandum of decision is there any serious effort to engage the essential question this case presents: why would someone in the defendant's position abandon his Horatio Alger life story to become an international fugitive confined to permanent self-exile in a country he left when he was a child? [Note Milkey-10] As defense counsel succinctly put it at the motion hearing, "his life is here, not just in America[,] but in Massachusetts." 

 The judge's conclusion that there is a high probability that the defendant would flee if released becomes particularly puzzling when one takes into account the defendant's knowledge that his 

 Page 130 

convictions likely will be vacated on appeal, as his counsel informed him with apparent accuracy. On top of this, no one needs to speculate about how the defendant would view the pros and cons of fleeing, because he faced essentially the same choice during the over three years that he was on pretrial release. In fact, assuming that the defendant will prevail in his pending appeal -- and, again, the Commonwealth has presented no reason why he will not -- he will return to pretrial status shortly.

While the judge acknowledged that the defendant did not try to flee while on pretrial release, he maintained that circumstances have dramatically changed now that the defendant "knows his defense failed and he must serve [four] to [five] years in prison." But the strength of the Commonwealth's case has not grown: the defendant always knew that he was not contesting the basic facts that he severely injured the victim by striking him with a glass, and that the trial would depend on his being able to convince the jury of his version of the events. While he did not succeed in that task at his first trial, the fact that it took the jury four days to convict him warrants some optimism about his prospects on retrial before a reconstituted jury not tainted by juror selection error.

It is true, as the Commonwealth argued at the stay hearing, that the defendant now "has already seen the inside of a jail, for the first time in his life." In this manner, the Commonwealth dishearteningly suggests that even if execution of the defendant's sentence initially should have been stayed pending appeal, his having been wrongly incarcerated still can be used to paint him as a flight risk, thereby justifying his continued incarceration. In any event, regardless of whether life in prison matched the defendant's expectations, I believe that any risk he would flee remains extremely low in light of his exceptional ties to the community and his demonstrated history of complying with the terms of his pretrial release.

The judge appears not to have credited the Commonwealth's extraordinary argument that the defendant's uncommonly strong community ties in Massachusetts actually increased his risk of flight. [Note Milkey-11] However, he otherwise went to considerable lengths to support his ultimate finding that the defendant presented an 

 Page 131 

"extreme risk of flight." First, based on the defendant's career success, assumptions about the costs he incurred in taking family trips, and the fact that he was able to secure private counsel, the judge ascribed to the defendant an unspecified degree of affluence. This in turn somehow made the defendant's fleeing to Morocco more likely. Putting aside the questionable logic of that reasoning, the judge did not account for the possibility -- recognized by the majority -- that whatever affluence the defendant enjoyed might have been consumed by his legal bills. The judge even went so far as to reason that because the defendant did not offer to post more than the original $10,000 security, this indicated that he may be "conserving funds to flee." Then, switching from viewing potential escape as an endeavor involving long-term planning, to viewing it as a "rash and impulsive act," the judge added that such behavior would be "consistent with" the "impuls[ive]" act for which the defendant was convicted.

Additionally, the judge took the unremarkable fact that the defendant's father -- a Moroccan citizen -- decided to return to Morocco after his wife died as "illustrating the continued pull of life in Morocco on [the defendant] and his extended family." Then, noting that the defendant's brothers sometimes visit their father in Morocco, the judge reasoned that "[f]leeing to Morocco thus would not cut [the defendant's] family ties, it would enhance them." That conclusion is impossible to square with the fact that if the defendant instead stayed in the country where he has lived his entire adult life, he could continue "spend[ing] practically every holiday, weekend and day with" the families of his brothers, one of whom lives in the very same house as him, and another who lives in an abutting town. [Note Milkey-12]

At the hearing on the stay motion, the judge noted that the jury did not accept the defendant's testimony about the specifics of the incident, and that he "didn't believe it in total either." I do not question the trial judge's competence to assess the credibility of the defendant's testimony. Rather, my concern is over the scope of what the judge ultimately drew from his assessment that such testimony was not entirely truthful. Specifically, the judge concluded that it was "impossible to rely on [the defendant's] 

 Page 132 

representations that he will not seek to flee." In the end, whether the defendant was entirely truthful in his recounting the details of the incident has little, if any, bearing on the likelihood that the defendant would flee the country if released.

4. Alternatives to incarceration. Having exaggerated the risks that the defendant would flee, the judge then did not pay sufficient attention to whether conditions of release could be put in place to mitigate those risks. In addition to reposting his pretrial bail and agreeing to a no-contact order, the defendant offered to surrender his passports, and to be subject to both a curfew and global positioning system (GPS) monitoring. The judge summarily dismissed these suggestions. For example, based on his surmise that the defendant had the means to pay more, the judge rejected the bail amount that had secured the defendant's attendance pretrial, and he did so without ever engaging in any discussion of whether there was a higher amount that could satisfy his security concerns. As noted, he even took the defendant's failure to propose an increase in the amount of security as affirmative evidence that he was planning his escape.

The judge also summarily dismissed GPS monitoring as "something you cut off right before you flee," and as "useless" in stopping "someone who's interested in fleeing," even though it is widely used as a tool for helping to secure a defendant's presence in the Commonwealth. See, e.g., Garcia, 486 Mass. at 348-349 (affirming stay of sentence after requiring bail, GPS monitoring, and home confinement with exceptions for work and legal and medical appointments). By failing to "engage[ ] in fair and meaningful consideration of reasonable alternatives relevant to the circumstances of the case," the trial judge abused his discretion. A Juvenile v. Commonwealth, 480 Mass. 1012, 1014 (2018).

The majority suggests that the manner in which the trial judge examined alternatives to detention can be justified on the ground that -- having been convicted -- the defendant no longer enjoys a presumption of innocence. See ante at 116-117, citing Commonwealth v. Hernandez, 481 Mass. 582, 594-595 (2019). Passing over the fact that the defendant has shown a strong likelihood that his conviction imminently will be vacated, at which point he would reclaim the presumption of innocence, I do not agree that this contextual difference excuses the trial judge's wholesale dismissal of reasonable alternatives that could address any perceived risk of flight. See, e.g., Polk v. Commonwealth, 461 Mass. 251, 251-252, 255 (2012) (affirming order by Supreme Judicial 

 Page 133 

Court single justice allowing convicted rapist to be released pending appeal on $10,000 bail and subject to certain conditions, even though trial judge and Appeals Court single justice had denied requested stay).

5. The single justice's role. Of course, as the majority points out, strictly speaking the issue before us is whether the single justice abused his own discretion, not whether the trial judge did so. However, to the extent the single justice was acting in " 'appellate' mode," Nash, 486 Mass. at 410, I think it is plain that he abused his discretion by affirming the trial judge's faulty reasoning.

The single justice declared that he was not merely acting in appellate mode, but also acting "de novo"; that is, that he came to the same conclusion as the trial judge after conducting his own independent examination of the matter. See Nash, 486 Mass. at 410. The extent to which the single justice actually engaged in such an independent review is not entirely clear, in part because his conclusions were couched throughout his decision in language deferential to the trial judge. For example, in the key concluding sentence of his discussion of the security concerns, the single justice summed up his conclusions as follows: "the trial judge's determination that the defendant presents a security risk is reasonable, and having reviewed the same considerations, I see no reason to disturb the judge's finding."

In addition, as the majority itself notes, the single justice made no mention of additional material that the defendant submitted, such as an affidavit from his wife that responded to the trial judge's unsupported conclusions about his finances. [Note Milkey-13] Nor did the single justice address the defendant's offer to increase the amount of security posted to $15,000 (with the money to be posted by one of the defendant's brothers). Perhaps the single justice had no duty to address these additional considerations; indeed, he had no legal obligation to conduct de novo review at all. See Nash, 486 Mass. at 410. But to the extent a single justice conducts his or her own independent review of the issues, a failure to examine the materials and arguments a defendant has presented undercuts any deference owed to that review.

In any event, even though the single justice here avoided some of the questionable embellishments on which the trial judge 

 Page 134 

relied, what is left are largely conclusory statements that bear the same flaws as the trial judge's analysis. [Note Milkey-14] In my view, the single justice abused his discretion whether he was reviewing the trial judge's decision or conducting his own independent review. [Note Milkey-15]

Conclusion. The defendant is an American citizen who has been a resident of Massachusetts his entire adult life. He made an exceptionally strong showing both that his convictions will be vacated on appeal and that he presents a minimal flight risk during the resolution of that appeal. He supported this by his flawless compliance with his pretrial release, his virtually nonexistent criminal history, his extraordinary ties to the community, and a personal story significantly more compelling than that of the defendant in Nash. Nevertheless, based almost entirely on the fact that the defendant enjoys dual citizenship because his father is Moroccan, the trial judge and single justice found that he presents an "extreme risk of flight." Their reasoning cannot withstand minimal scrutiny, much less the level of review that Nash has indicated is warranted. I therefore respectfully dissent.

FOOTNOTES
[Note 1] During the hearing on the defendant's posttrial motion for a stay, the judge observed that someone in the IAD "wouldn't show favoritism towards police but might have the opposite impact: the IAD investigates police for wrongdoing." 

[Note 2] The judge also revisited his reasoning for disallowing the peremptory challenge during the motion hearing. Although the judge stated at trial that defense counsel's reason for striking juror no. 32 was not adequate, at the hearing the judge stated that he was concerned the strike may have been motivated by implicit bias: "I think I was saying, although it wasn't intended, that the real reason was race." In other words, the judge may have disallowed the strike on genuineness grounds after all. We take no position on what weight, if any, to give the judge's posttrial comments. 

[Note 3] Even though the defendant had not raised the issue, the single justice also considered the generalized health risks to the defendant given "the fluidity of the [COVID-19] pandemic" and concluded that those risks did not "outweigh the significant security risk the defendant would pose if released." 

[Note 4] Thus the three-factor test, taking COVID-19 considerations into account, resembles the balancing test employed in civil cases for granting preliminary injunctions. See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980) ("What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits"). This sliding-scale balancing approach has not been applied to the traditional two-factor test for stays of criminal sentences. 

[Note 5] In Nash, 486 Mass. at 414, the court held that the single justice abused her discretion in vacating the stay granted by the trial judge because, among other errors, her analysis of the security factors was "underinclusive"; that is, she focused "primarily on the severity of the crimes," but the factors favorable to the defendant did not "feature significantly, if at all, in [her] independent assessment on the second factor." We discern no underinclusiveness in the trial judge's or the single justice's consideration of the security factor here. 

[Note 6] In Levin, 7 Mass. App. Ct. at 506, where the security factor was not an issue, we stated in dicta that "the customary and long-standing practice . . . is to grant stays of execution of prison sentences where a defendant demonstrates that he has a reasonable likelihood of success on appeal, unless the granting of such a stay poses risks which cannot be adequately dealt with through the mechanism of bail." Id. at 512. Our comment was addressed to the Commonwealth's argument that the defendants were being "accorded favorable treatment because of the fact that they are men of prominence in the community and of substance in material terms." Id. We do not read the dicta in Levin to suggest that the considerations for stays of execution of sentences are the same as those for setting bail. 

[Note 7] For this reason, the fact that the jury deliberated for four days prior to rendering a verdict is not, as our dissenting colleague suggests, an indication of the strength or weakness of the evidence -- or how the presence of juror no. 32 affected the deliberations. 

[Note 8] The defendant's brothers averred, "Our father does not live in Morocco full time." The defendant submitted this affidavit with the intent to qualify the prior statement in his sentencing memorandum that his "father returned to live in Morocco after his wife's death." 

[Note Milkey-1] According to an affidavit that was before the single justice but not the trial judge, the brother that had been living in Germany has "decided to move back to the United States [and] is in the process of relocating back to Massachusetts permanently." 

[Note Milkey-2] I note that the single justice did not have the benefit of having a complete trial transcript before him. On the other hand, the trial judge obviously had "firsthand" knowledge of what transpired at trial. See Commonwealth v. Hodge (No. 1), 380 Mass. 851, 856 & n.2 (1980). 

[Note Milkey-3] I realize this perspective could be viewed as lying in some tension with the fact that the cases place the burden on the defendant to demonstrate the absence of security concerns. See Nash, 486 Mass. at 406. While I accept this allocation of the burden for purposes of my analysis, I note that the cases do not discuss why the burden necessarily should fall on a defendant. Moreover, there are intimations in Nash itself that a defendant might not always bear that burden after all, at least in an unqualified manner. See, e.g., id. at 416 (reversing single justice order affirming trial judge's order revoking previously granted stay in companion case where there was "no evidence that [the defendant] could not remain safely at liberty temporarily, subject to the terms and restrictions imposed by the judge, during the pendency of his appeal"). In any event, the case before us aptly demonstrates the inherent difficulties of asking a defendant to prove a negative, namely that there is no chance he or she would flee. At some point, the Supreme Judicial Court may want to reexamine how the burden of proof is allocated, e.g., whether to place an initial burden of production on the defendant (at least with respect to security issues within his or her purview), while otherwise placing the burden of persuasion on the Commonwealth with regard to whether its security concerns justify the defendant's detainment pending appeal. 

[Note Milkey-4] The majority seeks to discount this passage from Levin as dicta by pointing out that in that case, the Commonwealth was not seeking to justify the defendants' detainment pending appeal based on security concerns, but rather on the weakness of their showing on the merits. See ante at note 6. However, the majority passes over our explanation in Levin as to why security concerns were not presented there, including that the "defendants are men with substantial roots in the community, who are active in professional or business affairs [without] any prior criminal involvement." Levin, 7 Mass. App. Ct. at 506. Such factors are also present here. 

[Note Milkey-5] As is discussed below, our review is whether the single justice abused his discretion. See Nash, 486 Mass. at 411-412. However, to the extent that the single justice was sitting in review of the trial judge, our review of whether the single justice abused his discretion necessarily implicates the trial judge's fact finding and reasoning. See, e.g., Garcia, 486 Mass. at 348-349. I therefore begin the discussion that follows with examining what the trial judge did and said. 

[Note Milkey-6] Examples abound where -- in reviewing a decision whether to grant a stay of execution -- appellate courts have examined the strength of the merits in some detail. See, e.g., Levin, 7 Mass. App. Ct. at 507-512 (five-page discussion of merits). 

[Note Milkey-7] At oral argument, we expressly invited the Commonwealth to defend the judge's disallowing the defendant's peremptory challenge. The Commonwealth not only declined that opportunity, but also argued that considering the particular strength of the defendant's case was "not [within] the court's purview." 

[Note Milkey-8] The majority does point out that a defendant's long-recognized right to make peremptory challenges is not grounded in constitutional doctrine. True enough. But that right nevertheless remains a part of the genetic code of the Massachusetts criminal justice system. And while I agree with the majority that the term "structural error" does not have "talismanic significance," ante at 117, quoting Weaver v. Massachusetts, 137 S. Ct. 1899, 1910 (2017), the fact remains that where, as here, a defendant timely objected, structural error requires that a conviction be vacated without any showing of prejudice. 

[Note Milkey-9] The majority itself draws an analogy between the test for deciding whether to stay execution of a criminal sentence, and the one that applies to civil motions to stay, under which a particularly strong showing on one prong can make up for a weaker showing on another. See ante at note 4, citing Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 617 (1980). Moreover, the majority also points out that Nash endorses the idea that a defendant's showing as to the three prongs must be viewed together as part of a "totality of the circumstances" approach. See ante at 114, citing Nash, 486 Mass. at 407 & n.17. The majority does not explain why that approach is inapplicable when only the first two prongs are at issue. 

[Note Milkey-10] The judge appears to have assumed that the defendant could not be extradited from Morocco, a legal issue that the judge never discussed. Although extradition from Morocco may be more difficult than from some other countries, it appears that there is a well-established treaty that allows extradition between the two countries on a case-by-case basis. See Convention Between the United States of America and the Kingdom of Morocco on Mutual Assistance in Criminal Matters, signed October 17, 1983, and ratified June 28, 1984, https://www.state.gov/wp-content/uploads/2019/02/93-623-Morocco-Mutual-Legal-Assist-Treaty.pdf [https://perma.cc/Y7E5-F8UN]. In any event, were the defendant to flee to Morocco, he could never return to the United States (where he has lived his entire adult life) or enter countries with which the United States has bilateral extradition treaties (such as Germany, where his brother resided at the time of trial) without facing arrest. 

[Note Milkey-11] The Commonwealth argued that the defendant's close community ties, including to all those who attended the stay hearing in support, provided him additional means to escape and to avoid detection. When pressed at oral argument, the Commonwealth affirmatively abandoned that argument, albeit while still suggesting that such evidence "can be argued on both sides." 

[Note Milkey-12] Even the judge's apparent assumption that the defendant could visit his father only in Morocco may be unfounded. In an affidavit submitted to the single justice, the defendant's brother pointed out that the father still lived about one-half the time in the United States. This affidavit was among the material, discussed below, that the single justice never mentioned. 

[Note Milkey-13] Specifically, the defendant's wife attested under the pains and penalties of perjury that the family was down to their last $7,000 in savings, and that the defendant was the sole source of financial support for her and her children. 

[Note Milkey-14] In fact, in some respects, the single justice's explanation is more incomplete. For example, his memorandum of decision contains no discussion of whether any risks of flight could be addressed through other means, such as commonly imposed conditions of release. 

[Note Milkey-15] I therefore need not address what outcome would follow if the single justice abused his discretion while acting in one of those roles, but not the other. The Commonwealth appears to assume that a remand would not be necessary unless the defendant is able to prove that the single justice erred in both roles. That is not self-evident to me, and I can see strong arguments on both sides of that issue. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.